**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CHEMEHUEVI INDIAN TRIBE;
TIFFANY T. ADAMS; DUSTI ROSE
BACON; MICHELLE DELORES
BARRETT; JUANA BUSH; ANGELA
CARRILLO; JOHN DEVILLA; WACO
ESCOBAR; MARK ESWONIA;
EMMANUEL EVANS; TONY FIXEL;
RIKKI HARPER; JESSE SEYMORE
GORDON; LEONA GORDON; JOHN W.
HERNANDEZ; HOPE HINMAN;
EVANGELINA HOOVER; ANGELA
MARIE JONES; SHARON MELISSA
KASEMAN; BRIAN KELLYWOOD;
JOSEPH ALAN LUSCH, JR.; STEVEN
DALE MADEROS; RAMON CAMPASS
MARTINEZ; MICHELLE MENDOZA;
HOWARD IRVING PEACH; SIERRA
PENCILLE; RAMONA MADALENE
POWELL; CHRISTINA RAY; RICHARD
SANDATE, JR.; ROBERTA SESTIAGA;
TITO KATTS SMITH; ADAM
TRUJILLO, JR.; ADAM STEVEN
TRUJILLO, SR.; SAMIYAH WHITE,
            *Plaintiffs-Appellants*,

v.

No. 12-56836

D.C. No.
2:11-cv-04437-
SVW-DTB


OPINION

SALLY JEWELL, Secretary of the
United States Department of the
Interior,
                    *Defendant-Appellee.*

Appeal from the United States District Court
for the Central District of California
Stephen V. Wilson, District Judge, Presiding

Argued and Submitted
April 7, 2014—Pasadena, California

Filed September 17, 2014

Before: Sidney R. Thomas, Milan D. Smith, Jr.,
and Morgan Christen, Circuit Judges.

Opinion by Judge Thomas

## SUMMARY[*]

### Tribal Affairs

The panel affirmed the district court's summary judgment
in favor of the Secretary of the United States Department of
the Interior in an action brought by the Chemehuevi Indian
Tribe alleging that the Secretary violated the Administrative
Procedure Act by determining that the Department of the

[*] This summary constitutes no part of the opinion of the court.  It has
been prepared by court staff for the convenience of the reader.

Interior was not authorized to approve the Tribe's assignments of land to certain of its members.

The Tribe issued land assignment deeds to some of its members, which the Tribe submitted to the Bureau of Indian Affairs Western Regional Director, seeking approval under 25 U.S.C. § 81 (2000) ("Section 81"). The Interior Board of Indian Appeals concluded that the deeds could not be approved under Section 81 because doing so would violate 25 U.S.C. § 177 ("Section 177").

The panel applied *Chevron* analysis, and at step one of the analysis, held that the plain language of Section 81 and Section 177 revealed that Congress did not intend for the Secretary of the Interior to approve agreements under Section 81 that would otherwise be prohibited by Section 177. The panel held that Section 177 prohibited the conveyance of land from an Indian Tribe unless approved by Congress, and Congress had not approved the transaction at issue here. The panel concluded that the Secretary of the Interior properly denied approval of the deeds under Section 81 because such conveyances would violate federal law.

---

**COUNSEL**

Lester J. Marston (argued) and Scott Johnson, Rapport and Marston, Ukiah, California, for Plaintiffs-Appellants.

William B. Lazarus, Elizabeth A. Peterson, and Thekla Hansen-Young (argued), United States Department of Justice, Environment & Natural Resources Division, Washington, D.C., for Defendants-Appellees.

---

## OPINION

THOMAS, Circuit Judge:

The Chemehuevi Indian Tribe and thirty-four of its members (collectively the "Tribe") appeal from the district court's grant of summary judgment in favor of the Secretary of the United States Department of the Interior ("Interior" or "Secretary"). The Tribe alleges that the Secretary, acting through the Bureau of Indian Affairs ("BIA"), violated the Administrative Procedure Act ("APA") by determining that Interior was not authorized to approve the Tribe's assignments of land to certain of its members. We affirm.

I

The Chemeheuvi Reservation ("Reservation") sits on 32,000 acres in San Bernardino County, California. Title to the Tribe's Reservation lands is owned and held in trust by the United States government. The Reservation's beautiful location belies a more turbulent history.

In the early 1940s, in order to provide water to burgeoning communities in California and nearby states, Congress condemned the bottom land of the Reservation—where all the members lived—in order to construct Parker Dam and create Lake Havasu. The Dam left the Reservation flooded, and all but one of the tribal families were forced to relocate off reservation. Many of the displaced members resettled in locations not far from the Reservation, including Burbank, Los Angeles, and Phoenix.

Eventually, the flooding subsided and the land became hospitable. As a result, in 1970, members of the Tribe sought

to reorganize the tribal government and provide incentives for its members to move back to the Reservation. Specifically, the Tribe has attempted over the past ten years to convey exclusive rights of use and possession of land to certain of its members, having concluded that many members who had resettled owned homes in their new communities and would likely need a large incentive before selling their existing homes and relocating to build new homes on the Reservation.

To that end, in 2001 the Tribe adopted Ordinance 01-08-25-1-A, which established procedures under which the Tribal Council can approve land assignment deeds to tribal members. Pursuant to the Ordinance and deeds, tribal members would "be allowed to occupy unassigned tribal trust lands for residential purposes . . . in a manner similar to [fee simple ownership] in land off the Reservation." The Ordinance describes the assignments as "formal exclusive right[s] to use and possess tribal land." The Tribe itself described the assignments as "interest[s] in the parcel of tribal land . . . that [were] as close to fee simple absolute as possible."

Pursuant to the Ordinance, the Tribe issued deeds to some of its members, which the Tribe then submitted to the BIA's Western Regional Director, seeking their approval under 25 U.S.C. § 81 (2000) ("Section 81"). The Regional Director declined to approve the deeds, and the Tribe appealed to the Interior Board of Indian Appeals ("IBIA").[1]

---

[1] This litigation has a somewhat complicated procedural history. The Tribe initially submitted a set of land assignments to the BIA for approval under Section 81. While that application was pending, the Tribe filed suit in federal district court to compel approval of the deeds. The district court eventually dismissed the suit in 2006 for failure to exhaust administrative

Reaching the merits of the appeal, the IBIA concluded that the deeds cannot be approved under Section 81 because doing so would violate 25 U.S.C. § 177 ("Section 177"). *Chemehuevi Indian Tribe v. W. Reg'l Dir.*, 52 IBIA 192, 192–93 (2010). Section 81(b) provides that "[n]o agreement or contract with an Indian tribe that encumbers Indian lands for a period of 7 or more years shall be valid unless that agreement or contract bears the approval of the Secretary." 25 U.S.C. § 81. Section 81(d)(1) requires the Secretary to reject agreements that "violate[] Federal law." *Id.*

The IBIA determined that the deeds are encumbrances under Section 81, and no party disputes this conclusion. As the IBIA explained, "[t]he Tribe's land assignment deeds meet this criteria because they grant to third parties (the assignees) a right of entry on, a claim to, and nearly exclusive proprietary control over a parcel of the Tribe's trust land to the exclusion of all others, including the Tribe." *Chemehuevi Indian Tribe*, 52 IBIA at 203.

The IBIA also concluded that the deeds are *conveyances* under 25 U.S.C. § 177. Section 177 provides that "[n]o purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto" from an Indian tribe is valid unless it is approved by Congress. Thus, the IBIA concluded that while

---

remedies. *Casanova v. Norton*, No. CV 05-1273-PHX-ROS, 2006 WL 2683514 (D. Ariz. Sept. 18, 2006). Before the district court ruled, the BIA issued its 2005 decision in which it declined to approve the land assignments. *Chemehuevi Indian Tribe v. Acting W. Reg'l Dir.*, 45 IBIA 81, 83 (2007). The Tribe appealed that decision to the IBIA, and the IBIA dismissed. The Tribe then submitted additional land assignments for BIA approval. The Regional Director declined to approve them in two separate letters. The Tribe then appealed to the IBIA from each of the two decisions.

the deeds encumber lands pursuant to Section 81—and therefore would otherwise be eligible for approval under that section—they also "convey an exclusive possessory interest that is intended to be perpetual" under Section 177. *Chemehuevi Indian Tribe*, 52 IBIA at 193. Reading the two sections together, and noting that Congress has not approved these types of assignments under Section 177, the IBIA determined that the Secretary could not approve the assignments. *Id.* at 211.

The Tribe then filed this action in District Court for the Central District of California, alleging that the Secretary violated the APA by not approving the deeds. The Tribe contended that the Secretary's final decision was erroneous because the deeds do not completely extinguish the Tribe's interest in the land—and thus do not violate Section 177. The Tribe also contended that Congress amended Section 81 so that assignments falling under that statute are no longer subject to Section 177.

Upon considering multiple motions, the district court granted summary judgment to the Secretary, concluding that the IBIA's interpretation of the relevant statutes and regulations was reasonable under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc*., 467 U.S. 837, 843–44 (1984). This timely appeal followed.

II

"We review de novo the district court's grant of summary judgment." *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 912 (9th Cir. 2008) (citation omitted). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a). No material facts are disputed.

The Tribe asks the court to set aside the Secretary's decision under the APA. We may overturn an agency's determination under the APA only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). We may review only those actions that have "adversely affected or aggrieved" someone, *id.* § 702, and that are final and without "other adequate remedy in a court." *Id.* § 704. We will not upset an agency's decision if "the agency's path may reasonably be discerned." *Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 497 (2004) (internal quotation marks and citation omitted).

We review the IBIA's interpretation of federal statutes under the methodology described in *Chevron* and its progeny. In reviewing the IBIA's decision, we first address "whether Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43. If, employing the "traditional tools of statutory construction," we determine that Congress has directly and unambiguously spoken to the precise question at issue, then the "unambiguously expressed intent of Congress" controls. *Id.* at 843 & n.9. In determining congressional intent, we not only examine the precise statutory section in question but also analyze the provision in the context of the governing statute as a whole, presuming a congressional intent to create a "symmetrical and coherent regulatory scheme." *FDA v. Brown &*

*Williamson Tobacco Corp.*, 529 U.S. 120, 132–33 (internal quotation marks and citation omitted) (2000).

Thus, at the first step of the *Chevron* analysis, if we conclude that Congress has directly spoken to the question, then we "must give effect to Congress's clearly expressed intent." *Adams v. U.S. Forest Serv.*, 671 F.3d 1138, 1143 (9th Cir. 2012); *see also Chevron*, 467 U.S. at 842 ("If the intent of Congress is clear, that is the end of the matter.").

However, if the statute is silent or ambiguous, we proceed to step two and defer to the agency's interpretation if it is "based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. Because we conclude that the intent of Congress is clear as to the statutes at issue in this appeal, we need not proceed to step two.[2]

### III

This case turns on the interpretation of two federal statutes: Section 81 and Section 177. Section 177 is part of the Indian Nonintercourse Act, whose "overriding purpose is the protection of Indian lands. It acknowledges and guarantees the Indian tribes' right of possession and imposes on the federal government a fiduciary duty to protect the lands covered by the Act." *United States for and on Behalf of Santa Ana Indian Pueblo v. Univ. of New Mexico*, 731 F.2d 703, 706 (10th Cir. 1984) (citations omitted). The goal of the statute is to ensure that tribal lands remain in tribal hands.

---

[2] As a result, we also need not address whether deference is warranted under the Indian Cannons of Statutory Construction or *Auer v. Robbins*, 519 U.S. 452 (1997).

*See Fed. Power Comm'n v. Tuscarora Indian Nation*, 362 U.S. 99, 119 (1960).

Section 177 provides that:

> No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution.

25 U.S.C. § 177.

Section 177 has been interpreted as prohibiting a great deal of transactions absent Congressional authorization. *See, e.g.*, *Oneida Indian Nation of N.Y. v. Oneida Cnty. of N.Y.*, 414 U.S. 661, 667–68 (1974) (holding that tribe prohibited from giving land to state without federal government's approval); *United States v. 7,405.3 Acres of Land*, 97 F.2d 417, 422 (4th Cir. 1938) (holding that Indian land may not be taken from tribe via adverse possession without government's approval); *Mashpee Tribe v. Town of Mashpee*, 447 F. Supp. 940, 948 (D. Mass. 1978) (holding that agreements between tribe and its members not exempt).

As originally enacted in 1872, Section 81 provided for a restraint on alienation designed to protect Indians from "improvident and unconscionable contracts [because] [a]t the time of the law's enactment, Indians apparently were being swindled by dishonest lawyers and claims agents." *Altheimer & Gray v. Sioux Mfg. Corp.*, 983 F.2d 803, 805 (7th Cir. 1993) (internal quotation marks and citations omitted). "In

1872, when Congress passed § 81, federal law provided that Indian tribes enjoyed the right to possess and occupy lands but not to alienate these lands without the federal government's approval." *Penobscot Indian Nation v. Key Bank of Maine*, 112 F.3d 538, 548 (1st Cir. 1997).

Prior to the 2000 amendments, Section 81 provided that:

> No agreement shall be made by any person with any tribe of Indians, or individual Indians not citizens of the United States, for the payment or delivery of any money or other thing of value, in present or in prospective, or for the granting or procuring any privilege to him, or any other person, in consideration of services for said Indians relative to their lands . . . unless such contract or agreement . . . bear the approval of the Secretary . . . and the Commissioner of Indian Affairs indorsed upon it.

25 U.S.C. § 81 (prior to March 14, 2000 amendments).

However, the former Section 81's language proved to be untenably broad. Because it required the Secretary's approval to contract for "services for Indians relative to their lands," the former Section 81 was "susceptible to the interpretation that *any contract* that 'touches or concerns' Indian lands must be approved." S. Rep. No. 106-150, at 8 (1999) (emphasis added). Indeed, "neither tribes, their partners nor the BIA could predict with any certainty whether a court might ultimately conclude that a transaction was void because it was not approved pursuant to Section 81." *Id.* at 5. As a result of this uncertainty over the statute's language,

and the "draconian" penalties that could be meted out for violating it, the Secretary received applications for approval of such commonplace contracts as sales of vehicles. *Id.* at 7, 9.

This confusion led Congress to clarify which agreements require federal approval. *Id.* at 1. Congress did so by amending Section 81 in two important ways: it limited the section to apply to only agreements concerning a duration of 7 or more years, and it replaced "relative to Indian lands" with "encumbering Indian lands." Section 81 as amended in 2000 provides that

> (b) No agreement or contract with an Indian tribe that encumbers Indian lands for a period of 7 or more years shall be valid unless that agreement or contract bears the approval of the Secretary.
>
> . . . .
>
> (d) The Secretary (or a designee of the Secretary) shall refuse to approve an agreement or contract that is covered under subsection (b) of this section if the Secretary (or a designee of the Secretary) determines that the agreement or contract–
>
> > (1) violates Federal law

25 U.S.C. § 81.

The 2000 amendments to Section 81 also granted authority to the Secretary to promulgate regulations

implementing the statute. 25 U.S.C. § 81(e). The regulations most relevant to this appeal include 25 C.F.R. § 84.003, which provides that "[u]nless otherwise provided in this part, contracts and agreements entered into by an Indian tribe that encumber tribal lands for a period of seven or more years require Secretarial approval under this part." 25 C.F.R. § 84.003.

25 C.F.R. § 84.002 provides that:

> Encumber means to attach a claim, lien, charge, right of entry or liability to real property (referred to generally as encumbrances). Encumbrances covered by this part may include leasehold mortgages, easements, and other contracts or agreements that by their terms could give to a third party exclusive or nearly exclusive proprietary control over tribal land.

25 C.F.R. § 84.002.

The regulations further explain which agreements are exempt from the Secretary's review, including those "that convey to tribal members any rights for temporary use of tribal lands, assigned by Indian tribes in accordance with tribal laws or customs." 25 C.F.R. § 84.004(d). Finally, the Secretary clarified that "[t]he Secretary will disapprove a contract or agreement that requires Secretarial approval under this part if the Secretary determines that such contract or agreement . . . [v]iolates federal law." 25 C.F.R. § 84.006.

We conclude that Congressional intent is clear. Section 177 prohibits the "grant, lease, or other conveyence of lands,

or of any title thereto" from an Indian tribe unless approved by Congress. Congress has not approved the transactions at issue here. Therefore, the Secretary properly denied approval of the deeds under Section 81 because such conveyences would violate federal law.

IV

A

The Tribe first contends that the assignments do not violate Section 177 under the Fifth Circuit's *Tonkawa Tribe of Oklahoma v. Richards*, 75 F.3d 1039 (5th Cir. 1996). The Tribe asserts that, under *Tonkawa*, only conveyances that completely extinguish a tribe's interests must be approved under Section 177. Because the deeds do not *completely* extinguish the Tribe's title to the land, the Tribe argues that they do not require Congressional approval.

As an out of circuit case, *Tonkawa* does not bind us. However, even if it did, it would not alter the outcome because it applies to situations in which a tribe loses all possible rights to the land, which is not the case here. In *Tonkawa*, the tribe asserted that the State of Texas had completely divested tribal title to the land. *Id.* The court held that a tribe, to prevail on a claim of a violation of Section 177, must show, among other things, that "the [t]ribe's title or claim to the interest in land has been extinguished without express consent of the United States." *Id.* at 1044. Thus, *Tonkawa* explains what is necessary for a tribe to succeed on a Section 177 claim when the right to the land has been completely extinguished. As the IBIA put it, "[i]t is beyond cavil that § 177 applies to such conveyances." *Chemehuevi Indian Tribe*, 52 IBIA at 207.

The statutory language of Section 177 confirms our reading of *Tonkawa*. Section 177 requires congressional approval of leases, grants, "or other conveyance[s] of lands, *or* of any title or claim thereto." 25 U.S.C. § 177 (emphasis added). In other words, Section 177 by its very language applies to conveyances of less than complete divestment, which is how the section has been interpreted by other bodies as well. *See, e.g.*, *Lease of Indian Lands for Grazing Purposes*, 18 Op. Att'y Gen. 235, 237 (1885); Solicitor's Opinion, M-31724, I Op. Solic. 1178 (Nov. 21, 1942) (explaining that Section 177 applies whether or not a transaction attempts to convey complete title); *United States v. S. Pac. Trans.*, 543 F.2d 676, 684 (9th Cir. 1976) (easements granting railroad rights of way on Tribal land are subject to Section 177, and thus invalid without Congressional authorization).

B

The tribe also asserts that even if the deeds are subject to Section 177, they may nevertheless be approved by the Secretary under Section 81. The Tribe contends that the deeds may be approved under the present Section 81 because Congress's amendments expanded the scope of the Secretary's authority to approve these types of encumbrances. In other words, the Tribe asserts that Congress, by amending Section 81, authorized the Secretary to approve conveyances of land that Section 177 would otherwise prohibit.

The plain language of Section 81 does not support the Tribe's reading. As explained above, Section 81 as amended explicitly prohibits approval of an agreement that is subject to its approval requirements if "the agreement or contract . . . violates Federal law." 25 U.S.C. § 81(d)(1). Section 177 is

part of federal law and prohibits any "purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians" that is not authorized by Congress.  25 U.S.C. § 177.

Without the support of the plain language of the statutes, the Tribe's argument instead becomes an argument that the amendments impliedly repealed Section 177.  But "repeal by implication is disfavored," *Ahlmeyer v. Nevada System of Higher Education*, 555 F.3d 1051, 1058 (9th Cir. 2009) (internal quotation marks and citation omitted), and nothing in the statute's language suggests that Congress intended to give the Secretary the authority to approve an agreement that otherwise falls within the scope of Section 177.

In fact, other of Congress's actions regarding tribal land reveals that it did not intend to repeal Section 177 by implication.   As we have explained, the Secretary may approve transactions that fall within the scope of Section 177 only if a law grants the agency the power to approve the transactions.  *Lease of Indian Lands for Grazing Purposes*, 18 Op. Att'y Gen. at 238.   Since enacting Section 177, Congress has explicitly approved many such transactions, thereby allowing them to go forward subject only to Interior's approval.  Of note, the statutes explicitly grant the Secretary the authority to approve the transactions. *See, e.g.*, 25 U.S.C. § 415 ("Any restricted Indian lands, whether tribally, or individually owned, may be leased by the Indian owners, with the approval of the Secretary of the Interior . . . . ); 25 U.S.C. § 323 ("The Secretary . . . is empowered to grant rights-of-way for all purposes" through lands held by the United States in trust for Indians.); 25 U.S.C. § 311 ("The Secretary . . . is authorized to grant permission . . . to the proper State or local authorities for the opening and establishment of public

highways."). Thus, when Congress intends to vest in the Secretary the power to approve a particular type of transaction, it has expressly stated its intention to do so. Moreover, and unlike Section 81, when Congress does grant this authority it has inserted no language indicating that approval would be subject to the agreements not "violating Federal law."

Tellingly, Congress has not made an exception for assignments, like the deeds here, that convey an exclusive possessory interest in perpetuity. Thus, Congress's decision to give the Secretary authority to approve a range of different types of assignments, while leaving alone land assignments of the kind at issue here, indicates that Congress did not intend to take those assignments outside of the scope of Section 177.

The relevant legislative history confirms that Congress, in amending Section 81, did not intend to alter that section's application vis-a-vis Section 177. As we have noted, former Section 81 was enacted to protect tribal land from alienation, and it did not authorize the Secretary to approve agreements that convey Indian land. However, the language of former Section 81 made it unclear which contracts required approval, and so Congress attempted to clarify the ambiguity.

One solution Congress considered was outright elimination of Section 81, which would have removed Interior from the equation and given tribes more autonomy over their lands. S. Rep. No. 106-150, at 9. However, that proposal was rejected in favor of the more modest

amendments that were ultimately adopted.[3]    As we have discussed, the amendments replaced the phrase "relative to Indian lands" with the phrase "encumbering Indian lands" and specified that approval was needed for only contracts "that encumber[] Indian lands for a period of seven or more years . . . ."  25 U.S.C. § 81(b).

In rejecting the proposal to outright eliminate Section 81, Congress explained that it intended to "leave[] the [amended] provision in place to address a limited number of transactions that could place tribal lands beyond the tribe's ability to control the lands in its role as proprietor."  S. Rep. No. 106-150, at 9.  In doing this, Congress narrowed the scope of those transactions that require approval.  "Section 81 [as amended] will no longer apply to a broad range of commercial transactions.  Instead, it will only apply to those transactions where the contract between the tribe and a third party could allow that party to exercise exclusive or nearly exclusive proprietary control over the Indian lands."  *Id.*  If Congress's intent could not be any more clear, one of the bill's proponents, Senator Campbell, summed it up: "All other federal laws will still apply to the agreement[s] . . . . [Amended Section 81 still] authorize[s] [the Secretary] to reject any contract that violates federal law."  145 Cong. Rec. S2648-03 at S2666-67 (145 Cong. Rec. 4441) (1990).

---

[3] The Tribe contends that amended Section 81 was part of a major iniative to promote tribal self-government and allow certain tribes the authority to determine under what conditions their lands can be encumbered.  However, as we have explained, Congress explicitly rejected a proposal to eliminate Section 81 altogether.  Rather, Congress simply reduced the number of transactions that require Secretarial approval.  Amended Section 81 still requires Secretarial approval for assignments that encumber land for more than seven years, and prohibits the Secretary from approving assignments that violate federal law.

As a final matter, we note that the IBIA correctly determined that the deeds assigned sufficient of the Tribe's interests that they are conveyances under Section 177. The deeds assign "a formal exclusive right to use and possess tribal lands," and the assignments may be transferred to, exchanged with, or leased to other individuals. If the assignee dies intestate, the land will descend to the assignee's survivors except in limited circumstances. An assigned plot can be canceled and returned to the tribe in only limited situations, such as if the assignee makes a transfer without tribal approval or commits a crime on the property. As the IBIA put it, most of these situations "are within the exclusive control of the assignees and none of which allow[s] the Tribe to revoke the assignment at will." *Chemehuevi Indian Tribe*, 52 IBIA at 196. In order for the Tribe to recover assigned property, it must pay fair market value for it and any improvements on its land. Additionally, the deeds waive the Tribe's sovereign immunity to suits by assignees to enforce the terms of the deeds.

The Solicitor's Office of the Department of the Interior has previously determined that these types of land assignments cannot be approved under Section 81 because they violate Section 177. In a 1942 opinion, the Solicitor of the Interior addressed a proposal by the Colville Tribe to sell to its members the exclusive use of tribal lands together with the right to devise or convey the property to another tribal member with the tribal council's consent. Solicitor's Opinion, M-31724, I Op. Solic. 1178 (Nov. 21, 1942). The deeds provided that "the lands and improvements . . . are held in trust for the tribe for the exclusive use and occupancy by the Indian purchaser during his lifetime." *Id.* The Solicitor determined that the proposed land assignments violated Section 177 because "[t]he element of purchase plus the

incidents of descent and alienation stamp the transaction as one designed to individualize the tribal title and create in the individual an enforceable vested interest." *Id.* at 1179–80.

As the IBIA explained, the same is true for the deeds here. According to the terms of the Ordinance, the Tribe would lose its right to use and possess the lands, the Tribe could reclaim the land in only limited and unintended circumstances, and the assignments convey rights of descent and alienation. Individuals would also have the rights to transfer, lease, and exchange the property with other tribal members. Therefore, the deeds fall within Section 177's prohibition.

In response, the Tribe argues that the IBIA's interpretation of Section 81 would render that section a nullity because the Secretary would be prohibited from approving any encumbrance that violates Section 177. But Section 81 "encumbrances" and Section 177 "conveyances" are not synonymous. In other words, agreements can "encumber" land under Section 81 without "conveying" lands under Section 177.

As the IBIA explained, "[t]hrough regulation, the Department has interpreted [Section] 81 to apply to encumbrances *not* governed by or subject to *other* statutes and regulations, such as leasing statutes or [Section] 177." *Chemehuevi Indian Tribe*, 52 IBIA at 193. The IBIA provided one example of an "encumbrance" that is not also a "conveyance": assignments of life estates to tribal members. *Id.* at 193 (citing *Rogers v. Acting Deputy Assistant Sec'y - Indian Affairs (Operations)*, 15 IBIA 13, 17 (1986)). There are others. As the district court pointed out, the commentary to the regulations promulgated pursuant to Section 81(e)

reveals other arrangements that could "encumber" Indian land without extinguishing a tribe's title to it:

> [A] restrictive covenant or conservation easement may encumber tribal land within the meaning of Section 81, while an agreement that does not restrict all economic use of tribal land may not. An agreement whereby a tribe agrees not to interfere with the relationship between a tribal entity and a lender, including an agreement not to request cancellation of the lease, may encumber tribal land, depending on the contents of the agreement. Similarly, a right of entry to recover improvements or fixtures may encumber tribal land, whereas a right of entry to recover personal property may not.

66 Fed. Reg. 38,918, 38,920–21 (July 26, 2001); *see also* S. Rep. No. 106-150, at 9 (noting, for example, a lender-financed transaction in which the lender "receive[s] an interest in tribal lands as part of that transaction.").

To be sure, determining what constitutes an encumbrance can be difficult, in part because there is clearly some overlap between Section 81 "conveyances" that are prohibited by Section 177 and "encumbrances" that would be permissible under Section 81 if not for Section 177. But this ambiguity has existed since the statutes became law over one hundred years ago. In fact, by amending Section 81, and thereby narrowing the range of assignments that require the Secretary's approval, Congress has actually reduced the overlap. Moreover, Interior has also acknowledged the difficulty of determining what constitutes an encumbrance

and has stated that such determinations are made on a "case-by-case basis." 6 Fed. Reg. at 38,920–21 (July 26 2001).[4]

### V

In sum, we conclude that the plain language of Section 81 and Section 177 reveals that Congress did not intend for the Secretary to approve agreements under Section 81 that would otherwise be prohibited by Section 177. Therefore, we "stop the music at step one," and "give effect to [Congress's] unambiguously expressed intent." *Gila River Indian Cmty. v. United States*, 729 F.3d 1139, 1149 (9th Cir. 2013) (quoting *Northpoint Tech., Ltd. v. FCC*, 412 F.3d 145, 151 (D.C. Cir. 2005). We therefore affirm the judgment of the district court.

In closing, we acknowledge that our holding today does not aid the Chemehuevi Indian Tribe, which has taken reasonable steps to return its members to the Reservation and restore the Tribe. However, the solution to ensuring the Tribe's future lies in Congress, not the courts.

**AFFIRMED.**

---

[4] The Tribe further contends that the IBIA's interpretation of Section 81 conflicts with the Indian Reorganization Act, 25 U.S.C. § 476 ("IRA"). The Tribe points out that the IRA gave tribes "authority to determine the terms and conditions under which encumbrance[s] take place." But that section allows tribal constitutions to adopt provisions by which tribes can *prevent* the assignments of lands. 25 U.S.C. § 476 (proving that tribal constitutions may "prevent the sale, disposition, lease, or encumbrance of tribal lands, interests in lands, or other tribal assets without the consent of the tribe"). Thus, the IRA is consistent with Congress's general intention to restrict alienation of Indian lands.