# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | | |
|---|---|---|
| OUTSOURCE SERVICES MANAGEMENT, LLC., | ) ) ) | No. 74764-9-I |
| Respondent, | ) ) | |
| v. | ) ) ) | |
| NOOKSACK BUSINESS CORPORATION, | ) ) ) ) | UNPUBLISHED OPINION |
| Appellant. | ) ) ) | FILED: April 3, 2017 |

VERELLEN, C.J. — The Nooksack Business Corporation (NBC) borrowed more than $15 million to finance construction of and improvements to a casino on Nooksack Indian Tribe land. 25 U.S.C. § 81(b) (Section 81) requires preapproval by the Secretary of the Interior for any agreement or contract that "encumbers" tribal land. NBC's limited recourse loan is secured by a pledge of revenue to the lender. But because the lender's right to collect pledged revenues does not deprive the tribe of its exclusive proprietary control of its land, the loan agreements do not encumber tribal land for purposes of Section 81.

Under the broad language of the loan agreements, the lender may execute upon future revenues and rents whether or not the facilities are used as a casino. Additionally, merger does not preclude the lender from executing upon assets pledged as security for the loan. And, consistent with our Supreme Court's decision in a prior

appeal between the lender and NBC, the state court has subject matter jurisdiction to adjudicate the lender's right to enforce its judgment.

The loan agreement provides for attorney fees to the prevailing party. Because the lender is the prevailing party, it is entitled to attorney fees on appeal.

Therefore, we affirm.

## FACTS

NBC, wholly-owned by the Nooksack tribe, borrowed funds to build and improve a casino on tribal land. Outsource Services Management (OSM) is the successor of the original lender. NBC, the tribe, and the lender[1] entered into several written agreements, including the terms of the loans and the lender's collection rights upon default. The loan agreements were limited recourse agreements, which restricted the lender's collection rights to the pledged assets. The pledged assets include pledged revenues, defined as:

> *[W]hether now existing or hereafter arising, and wherever located*, all receipts, revenues and rents from the operation of *any portion of the Facilities*, including, without limitation, receipts from:
>
> (a) class II and class III gaming . . . including, without limitation, receipts from bingo, slot machines, and card games;
>
> (b) on-site facilities for dining, food service, beverage, restaurant and other concessions derived therefrom;
>
> (c) any other facilities financed in whole or in part with Recourse Debt;
>
> (d) the lease or sublease of space or Equipment within, on or at the Facilities;
>
> (e) the disposition of all or any portion of any Facilities; and
>
> (f) any other activities carried on within the Facilities, including license fees or the net proceeds of business interruption insurance (or its

---

[1] The original lender, BankFirst, and OSM, as BankFirst's successor.

equivalent) obtained by or on behalf of the Borrower with respect to the Facilities.[2]

"Facilities" are defined as "all Equipment and Improvements used in connection with the Nooksack River Casino."[3] "Improvements" are defined as "any buildings and improvements to land."[4]

The agreements "continue in full force and effect until all outstanding Secured Obligations shall have been paid in full."[5] The lender expressly agreed it has no control over the management of the facilities.[6] And the agreement "does not encumber any land of the Borrower or to otherwise subject this [agreement] to the requirements of 25 U.S.C. § 81."[7]

OSM sued NBC after it defaulted in 2010. NBC challenged the state court's subject matter jurisdiction in a prior appeal. Our Supreme Court held the waiver of sovereign immunity and consent to be sued in state court provided Whatcom County Superior Court with subject matter jurisdiction "for claims related to the contract."[8] On remand, NBC filed a counterclaim for declaratory judgment, including a determination that pledged assets and revenues do not extend to any funds received by NBC or the

---

[2] CP at 674 (emphasis added).

[3] CP at 669. Because this loan is secured only by limited recourse debt, see Section 9.21, CP at 702, the alternate definition of "facilities" including equipment, land and improvements does not apply.

[4] CP at 670.

[5] CP at 696.

[6] CP at 701.

[7] CP at 701.

[8] Outsource Servs. Mgmt., LLC v. Nooksack Bus. Corp., 181 Wn.2d 272, 277, 333 P.3d 380 (2014).

tribe for activity after the casino ceased operations. OSM moved for summary judgment.

On May 7, 2015, the court granted OSM summary judgment for the amount of the outstanding debt.[9] The trial court also limited enforcement of the judgment "by the terms of the loan documents and the Indian Gaming Regulatory Act,"[10] stayed execution of the judgment until the parties identified the assets available for execution, and prohibited NBC and the tribe from transferring, disposing of, or interfering with pledged assets from the casino.[11]

On January 13, 2016, the court issued a letter opinion finding the loan agreements valid and enforceable. The court also ruled OSM has "the right to revenues received by NBC or the Tribe from activities at the Facilities," even though the casino closed.[12] The court reasoned:

> NBC argues that the loan agreements are not valid because making Facilities revenues available to collection would be the equivalent of giving OSM a legal interest in the Facilities themselves—an interest prohibited by the loan agreements and by the law. But there are significant differences between a *legal ownership interest* and *the right to collect revenues*, and the loan agreements recognize this fact. *The agreements make it clear that NBC and the Tribe are the Facilities' sole owners and decision makes.* They give the lender no authority to determine or influence the use of the Facilities. NBC and the Tribe may choose to use the Facilities in a manner that generates no income; the agreements give them that opinion. If the Facilities are used in a manner that generates income, however, that income is a Pledged Revenue subject to collection. The loan agreements are consistent with the law.[13]

---

[9] The judgment included $20,725,716.90, plus interest of $3,523.86 per day after February 9, 2015. CP at 1077.

[10] 25 U.S.C. chapter 29.

[11] CP at 1078.

[12] CP at 1674.

[13] CP at 1673 (emphasis added).

The trial court denied NBC's motion for reconsideration, emphasizing that "OSM's right to enforce the Judgment through execution on Pledged Revenues includes the right to all revenue from activities conducted at the Facilities."[14]

NBC appeals.

## ANALYSIS

### I. Section 81

NBC argues the loan agreements are invalid under Section 81 because they encumber the tribe's trust property and lack the required preapproval from the Secretary of the Interior.[15]

Statutory interpretation is a question of law that we review de novo.[16] The fundamental objective in interpreting a federal statute is to ascertain congressional intent.[17] The traditional rules of statutory interpretation apply.[18] If the statute's meaning is plain on its face, we give effect to that plain meaning as an expression of legislative intent.[19] To determine a statute's plain meaning, we look to the language of the statute itself and the context of the statute, including related statutes.[20] If the statute is susceptible to more than one reasonable interpretation, we may resort to statutory

---

[14] CP at 1706.

[15] Appellant's Br. at 16.

[16] Jametsky v. Olsen, 179 Wn.2d 756, 761-62, 317 P.3d 1003 (2014).

[17] First Citizens Bank & Trust Co. v. Harrison, 181 Wn. App. 595, 602, 326 P.3d 808 (2014).

[18] Id.

[19] Id.

[20] Id.

construction, legislative history, and relevant case law for assistance in determining legislative intent.[21]

Section 81 provides, "No agreement or contract with an Indian tribe *that encumbers Indian lands* for a period of 7 or more years shall be valid unless that agreement or contract bears the approval of the Secretary of the Interior or a designee of the Secretary."[22]  Section 81 does not provide a definition of "encumber," but the related federal regulation, 25 C.F.R. § 84.002, defines "encumber" as:

> [T]o attach a claim, lien, charge, right of entry or liability to real property (referred to generally as encumbrances).  Encumbrances covered by this part may include leasehold mortgages, easements, and other contracts or agreements that *by their terms could give to a third party exclusive or nearly exclusive proprietary control over tribal land.*[23]

As originally enacted in 1872, Section 81 reflected, "Congressional concerns that [Native Americans], either individually or collectively, were incapable of protecting themselves from fraud in the conduct of their economic affairs."[24]  Before its amendment in 2000, Section 81 focused on preapproval for agreements "relative to their lands."

---

[21] Id.

[22] 25 U.S.C. § 81(b) (emphasis added).

[23] 25 C.F.R. § 84.002 (emphasis added); see GasPlus, L.L.C. v. United States Dep't of Interior, 510 F. Supp. 2d 18, 29 (D.D.C. 2007).

[24] S. REP. No. 106-150, at 2 (1999); Chemehuevi Indian Tribe v. Jewell, 767 F.3d 900, 904 (9th Cir. 2014) ("As originally enacted in 1872, Section 81 provided for a restraint on alienation designed to protect [Native Americans] from 'improvident and unconscionable contracts [because] [a]t the time of the law's enactment, [Native Americans] apparently were being swindled by dishonest lawyers and claims agents.'" (second and third alterations in original) (quoting Altheimer & Gray v. Sioux Mfg. Corp., 983 F.2d 803, 805 (7th Cir. 1993))); see In re U.S. ex rel. Hall, 825 F. Supp. 1422, 1431 (D. Minn. 1993), aff'd sub nom. U.S. ex rel. Hall v. Creative Games Tech., Inc., 27 F.3d 572 (8th Cir. 1994); Shaw v. Gibson-Zahniser Oil Corp., 276 U.S. 575, 578-79, 48 S. Ct. 333, 72 L. Ed. 709 (1928).

Because the provision "relative to their lands" was "'susceptible to the interpretation that any contract that touches or concerns' [tribal] lands must be approved,'" Congress concluded it was "untenably broad."[25] Congress sought to foster business and entrepreneurship on tribal land[26] and promote "modern attitudes towards tribal self-determination."[27]

As a result, Congress "limited the section to apply to only agreements concerning a duration of 7 or more years, and it replaced 'relative to Indian lands' with 'encumbering Indian lands.'"[28] The comments to the new Section 81,[29] explain:

> Section 81 [as amended] will no longer apply to a broad range of commercial transactions. Instead, it will only apply to those transactions where the contract between the tribe and a third party could allow that party to exercise *exclusive or nearly exclusive proprietary control over the [tribal] lands.*[30]

The Senate Report that accompanied the bill[31] gives examples:

---

[25] Chemehuevi, 767 F.3d at 905 (emphasis omitted) (internal quotation marks omitted) (quoting S. REP. No. 106-150, at 2).

[26] See S. REP. No. 106-150, at 9; 145 CONG. REC. S2648, S2667 (daily ed. Mar. 15, 1999) (statement of Sen. Campbell) ("Excessive federal regulation, especially if it impedes business and economic development in Indian Country, needs to be eliminated. Whether we put this belief in terms of the Contract with America, or the initiative to reinvent government, our objective is the same. There is no group of people who have experienced more federal regulation of every aspect of their lives than Indians. This bill represents a commitment to reduce unnecessary and anachronistic federal bureaucratic requirements.").

[27] GasPlus, 510 F. Supp. 2d at 28 (citing S. REP. 106-150; Encumbrances of Tribal Land—Contract Approvals, 65 Fed. Reg. 43,952 (July 14, 2000) (notice of proposed rulemaking) (noting that the old Section 81 "was a relic of a paternalistic policy towards [Native] tribes prevalent at the end of the nineteenth century")).

[28] Chemehuevi, 767 F.3d at 905.

[29] The proposed bill was passed as Pub. L. No.106-179 (S. 613), 114 Stat. 46 (2000).

[30] S. REP. No. 106-150, at 9 (emphasis added).

[31] S. REP. No. 106-150, at 1 ("[To accompany S. 613]").

7

For example, a lender may finance a transaction on [a Native] reservation and receive an interest in tribal lands as part of that transaction, If, for example, one of the remedies for default would allow this interest to ripen into authority to operate the facility, this would constitute an adequate encumbrance to bring the contract within Section 81. *By contrast, if the transaction concerned "limited recourse financing" and the lender merely acquired the first right to all of the revenue derived from specified lands for a period of years, this would not constitute a sufficient encumbrance to bring the transaction within Section 81.*[32]

.The commentary to the Bureau of Indian Affairs regulation defining "encumber" echoes the same examples contained in the Senate Report:

[T]he legislative history of Section 81 states, for example, that, if the default provision in a contract or agreement allows a third party (e.g., a lender) to operate the facility, that contract or agreement would "encumber" tribal land within the meaning of Section 81. *If, however, the lender is only entitled to first right to the revenue from the facility, the contract or agreement would not "encumber" tribal land.*[33]

In GasPlus, L.L.C. v. United States Department of Interior, GasPlus and the Nambe Pueblo Tribe signed an agreement that allowed GasPlus to "manage, supervise, and operate [Nambe Pueblo's] *Gasoline Distribution Business*."[34] The D.C. District Court concluded the management agreement did not encumber tribal lands under Section 81 because it "merely gave GasPlus day-to-day management control over the gasoline distribution business, *not a right to exercise proprietary control over the Nambe Pueblo's land*."[35] The court expressly held:

Thus, under Section 81 and the implementing regulations, a contract that "encumbers Indian lands" is a contract that, by its terms, provides a third party with a legal interest in the land itself; that is, a right or claim attached

---

[32] S. REP. NO. 106-150, at 9 (emphasis added).

[33] Encumbrances of Tribal Land—Contract Approvals, 66 Fed. Reg. 38918, 38920 (July 26, 2001) (final rule) (emphasis added).

[34] 510 F. Supp. 2d 18, 21 (D.D.C. 2007) (emphasis added).

[35] Id. at 33 (emphasis added).

to the real property that would interfere with the tribe's exclusive proprietary control over the land.[36]

Here, OSM has the right to receipts, rents, and revenue, from the operation of any portion of the Facilities, now or hereafter arising, and whenever received. But it has no right to control the activity on the land. The pledged security is not a legal interest in the land itself. Nor does OSM's right interfere with the tribe's exclusive proprietary control over the land. The examples in the Senate Report and the commentary to the rule defining "encumber" squarely match these facts: OSM has limited recourse financing and retains a right to income from the facilities, but not the right to the land or to control operation of the facilities. Because the tribe retains complete control over the casino building and property and can use the facilities for any purpose, there is no encumbrance for purposes of Section 81, and thus the agreements did not require preapproval.[37]

NBC also argues that a separate provision of the agreement restrains alienation, which should be viewed as a form of encumbrance requiring preapproval under Section 81. But NBC failed to raise this argument to the trial court.

Generally, this court does not review an issue, theory, argument, or claim of error not presented at the trial court level.[38] Failure to raise the issue before the trial court

---

[36] Id. at 29.

[37] Contrary to OSM's suggestion at oral argument, the GasPlus court did not discredit the value of the Senate Report examples; the court merely disagreed with the Bureau of Indian Affairs' reliance on the Senate Report examples because "[w]hen the entire example is read in context, *it is clear that the example is describing a contract very different from the Management Agreement* [with GasPlus]." See GasPlus, 510 F. Supp. 2d at 31 (emphasis added).

[38] Mukilteo Ret. Apartments, L.L.C. v. Mukilteo Inv'rs L.P., 176 Wn. App. 244, 258, 310 P.3d 814 (2013); RAP 2.5(a).

"precludes raising the error on appeal."[39] "'While an appellate court retains the discretion to consider an issue raised for the first time on appeal, such discretion is rarely exercised.'"[40] RAP 2.5(a) "reflects a policy of encouraging the efficient use of judicial resources.

We decline to consider NBC's restraint on alienation theory raised for the first time on appeal.

## II. Future Revenues

NBC acknowledges that pledged revenues includes rents and receipts NBC receives from operations incidental or complementary to the casino,[41] but contends the agreement does not include "*future* receipts from the operation by someone other than NBC or a business other than the Casino and its complementary business activities."[42] NBC argues allowing such an expansive view would "allow OSM to expand its recourse beyond what the parties contemplated and agreed."[43]

Washington courts "'follow the objective manifestation theory of contracts'":

> When interpreting an agreement, we focus on the agreement's objective manifestations to ascertain the parties' intent. "We impute an intention corresponding to the reasonable meaning of the words used." The parties' subjective intent is irrelevant if we can ascertain their intent from the words in the agreement.
>
> We give words "their ordinary, usual, and popular meaning unless the entirety of the agreement clearly demonstrates a contrary intent." We interpret only what was written in the agreement, not what the parties

---

[39] Ainsworth v. Progressive Cas. Ins. Co., 180 Wn. App. 52, 81, 322 P.3d 6 (2014).

[40] Id. (quoting Karlberg v. Otten, 167 Wn. App. 522, 531, 280 P.3d 1123 (2012).

[41] Appellant's Br. at 37, n.12.

[42] Id. at 37.

[43] Id. at 38.

intended to write.[44] Additionally, "[a] contract provision is not ambiguous merely because the parties to the contract suggest opposing meanings." We "will not read ambiguity into a contract where it can reasonably be avoided."[45]

Here, the pledge of revenues signed by NBC and the tribe is expansive: "whether now existing or hereafter arising, and wherever located, all receipts, revenues and rents from the operation of any portion of the Facilities."[46] And "Facilities" is defined to include "all Equipment and Improvements."[47] "Improvements," in turn, is defined to include "any buildings and improvements to land."[48] Therefore, on its face, the pledged revenues extend to *any* past, existing, or future revenues from the operation of *any* portion of the facilities.

Contrary to NBC's suggestion, the loan documents do not limit pledged revenues to gaming but broadly extend to any activity that generates revenue. This includes future revenues until the loan is paid in full or the judgment expires after 20 years. At oral argument, NBC asserted that a pledge of revenues which extends to future rents would run afoul of Section 81. But the pledge of any future revenues does not inhibit the tribe's proprietary control over use of the land. NBC and the tribe have unfettered decision-making authority over the use of the facilities.[49]

---

[44] Martin v. Smith, 192 Wn. App. 527, 532, 368 P.3d 227 (2016) (quoting Hearst Commc'ns, Inc. v. Seattle Times Co., 154 Wn.2d 493, 503, 504, 115 P.3d 262 (2005)).

[45] Id. (internal quotation marks omitted) (quoting GMAC v. Everett Chevrolet, Inc., 179 Wn. App. 126, 135, 317 P.3d 1074

[46] CP at 674.

[47] CP at 669.

[48] CP at 670.

[49] See CP at 701 (Section 9.15).

The trial court did not err in concluding that OSM has a valid right to execute upon future revenues from use of the facilities.

### III. Merger

NBC argues the loan agreements are no longer enforceable because they merged into OSM's judgment.[50]

Generally, when a valid final judgment for the payment of money is rendered, the original claim is extinguished and a new cause of action on the judgment is substituted for it.[51] Such merger is a form of claim preclusion that prevents a party from suing twice on the same contract.[52] But merger does not extinguish a judgment creditor's special rights, such as executing upon the creditor's security for the underlying debt. In Boeing Employee's Credit Union v. Burns, this court concluded that a creditor "may first sue on a note and later enforce rights and remedies under the security interest securing that note."[53]

Merger does not preclude the trial court from defining which assets OSM may execute upon.

### IV. Subject Matter Jurisdiction

NBC argues the trial court exceeded its subject matter jurisdiction when it entered its order recognizing OSM's rights to enforce its judgment. Specifically, NBC contends that its waiver of sovereign immunity is limited.[54]

---

[50] Appellant's Br. at 40.

[51] Caine & Weiner v. Barker, 42 Wn. App. 835, 837, 713 P.2d 1133 (1986).

[52] See Boeing Employee's Credit Union v. Burns, 167 Wn. App. 265, 276-77, 272 P.3d 908 (2012) (quoting id.).

[53] 167 Wn. App. 265, 277, 27 P.3d 908 (2012).

[54] Appellant's Br. at 44.

12

"Subject matter jurisdiction typically refers to the authority of a court to provide relief, as granted by the constitution or the legislature."[55] Subject matter jurisdiction was expressly addressed in the prior appeal of this same litigation to this court and our Supreme Court. By virtue of the tribe's and NBC's contractual waiver of sovereign immunity and express consent to be sued in any court of general jurisdiction in this state, the state court has subject matter jurisdiction "for claims related to the contract."[56]

Our Supreme Court's decision is binding on remand. Notably, NBC filed a counterclaim for declaratory relief.[57] It would be incongruous for NBC to assert the trial court had jurisdiction to grant its declaratory claim but lacked the jurisdiction to deny it. Once a court has subject matter jurisdiction over a dispute, it does not lose such jurisdiction merely by ruling in favor of one party.

As in the prior appeal, NBC does not establish these court proceedings infringe on the tribe's right to self-rule.[58] We conclude the trial court had subject matter jurisdiction to construe and enforce these loan agreements.

*V. Attorney Fees On Appeal*

Both parties request reasonable attorney fees on appeal. The loan agreement provides for attorney fees for the prevailing party.[59] "A contractual provision for attorney

---

[55] J.A. v. State Dep't of Soc. & Health Servs., 120 Wn. App. 654, 657, 86 P.3d 202 (2004).

[56] Outsource, 181 Wn.2d at 277.

[57] CP at 636 ("seeking a declaration regarding limitations on the tools available to [OSM], and the tools that are unavailable to it as a matter of law, to enforce and execute on any judgment it obtains against NBC"); CP at 1704.

[58] See Outsource, 181 Wn.2d at 278-82.

[59] CP at 62-63.

fees at trial also supports an award of attorney fees on appeal."[60]  Because OSM is the prevailing party, we conclude it is entitled to attorney fees on appeal upon compliance with RAP 18.1(d).

We affirm.

WE CONCUR:

_Becker, J._

---

[60] <u>Dragt v. Dragt/DeTray, LLC</u>, 139 Wn. App. 560, 578, 161 P.3d 473 (2007); RAP 18.1.