# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued October 12, 2007          Decided February 15, 2008

No. 06-5203

CALIFORNIA VALLEY MIWOK TRIBE *F/K/A* SHEEP RANCH OF
ME-WUK INDIANS OF CALIFORNIA,
APPELLANT

v.

UNITED STATES OF AMERICA, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 05cv00739)

———

*Phillip Eugene Thompson* argued the cause for appellant. With him on the briefs were *Johnine Clark* and *Sonya Anjanette Smith-Valentine*.

*Mark R. Haag*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were *James Merritt Upton* and *Katherine J. Barton*, Attorneys.

*Tim Vollmann* argued the cause and filed the brief for *amicus curiae* Yakima K. Dixie in support of appellees.

Before: GRIFFITH, *Circuit Judge*, and EDWARDS and WILLIAMS, *Senior Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

GRIFFITH, *Circuit Judge*: Since the days of John Marshall, it has been a bedrock principle of federal Indian law that every tribe is "capable of managing its own affairs and governing itself." *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 16 (1831); *see also Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 559 (1832) (stating that tribes are "distinct, independent political communities, retaining their original natural rights"). But tribes that want federal benefits must adhere to federal requirements. The gateway to some of those benefits is the Indian Reorganization Act of 1934 ("the Act"), which requires tribes to organize their governments by adopting a constitution approved by the Secretary of the Interior ("Secretary"). *See* 25 U.S.C. § 476.

This case involves an attempt by a small cluster of people within the California Valley Miwok tribe ("CVM") to organize a tribal government under the Act. CVM's chairwoman, Silvia Burley, and a group of her supporters adopted a constitution to govern the tribe without so much as consulting its membership. The Secretary declined to approve the constitution because it was not ratified by anything close to a majority of the tribe. Burley and her supporters—in CVM's name—then sued the United States, claiming that the Secretary's refusal was unlawful and seeking a declaration that CVM is organized pursuant to 25 U.S.C. § 476.[1]  Because

---

[1] Throughout, we refer to Burley rather than "CVM" or "the tribe" because we are mindful that there is an ongoing leadership dispute between Burley and former tribal chairman Yakima Dixie. Both claim to represent the tribe, and Dixie filed an amicus brief in this

we conclude that the Secretary lawfully refused to approve the proposed constitution, we affirm the district court's dismissal of Burley's claim. Burley also argues that the district court erred in denying her motions for leave to file supplemental claims for relief. We conclude that any such error was harmless.

**I.**

Indian tribes are "unique aggregations possessing attributes of sovereignty over both their members and their territory; they are a separate people possessing the power of regulating their internal and social relations." *United States v. Mazurie*, 419 U.S. 544, 557 (1975) (internal quotation marks and citations omitted). To qualify for federal benefits, however, tribes must meet conditions set by federal law. The most important condition is federal recognition, which is "a formal political act confirming the tribe's existence as a distinct political society, and institutionalizing the government-to-government relationship between the tribe and the federal government." COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 3.02[3], at 138 (2005 ed.). The federal government has historically recognized tribes through treaties, statutes, and executive orders, but it does so today primarily by a standardized application process administered by the Secretary. *See generally* 25 C.F.R. pt. 83; *see also id.* § 83.7 (listing the factors the Secretary must consider when deciding whether to recognize a tribe). Among the federal benefits that a recognized tribe and its members may claim are the right to receive financial assistance under the Snyder Act, *see* 25 U.S.C. § 13 (authorizing the Secretary to "direct, supervise, and expend" funds for a range of purposes including health

---

case in support of the United States. We pass no judgment on that dispute.

and education), and the right to operate gaming facilities under the Indian Gaming Regulatory Act, *see* 25 U.S.C. §§ 2701 *et seq.*[2]

Once recognized, a tribe may qualify for additional federal benefits by organizing its government under the Act. "[Section 476 of the Act] authorizes any tribe . . . to adopt a constitution and bylaws, subject to the approval of the Secretary of the Interior." *Kerr-McGee Corp. v. Navajo Tribe of Indians*, 471 U.S. 195, 198 (1985). Organization under § 476 vests in a tribe the power "[t]o employ legal counsel; to prevent the sale, disposition, lease, or encumbrance of tribal lands, interests in lands, or other tribal assets without the consent of the tribe; and to negotiate with the Federal, State, and local governments." 25 U.S.C. § 476(e). And some governmental benefits may flow only to tribes organized under the Act. For example, in this case the California Gaming Control Commission—which distributes an annual payment to all non-gaming tribes in the state—suspended CVM's allotment of approximately $1 million when it learned that CVM was unorganized.[3]

Section 476 of the Act provides two ways a tribe may receive the Secretary's approval for its constitution. The first is, in effect, a safe harbor. Section 476(a) says:

> Any Indian tribe shall have the right to organize for its common welfare, and may

---

[2] According to the government, Burley wishes to build and operate a casino for CVM. Government's Brief at 10–11.

[3] The stakes for CVM may be raised even higher if California's gaming tribes expand their casinos, as news reports suggest they are planning to do. *See The New Indian Wars*, ECONOMIST, Nov. 29, 2007.

adopt an appropriate constitution and bylaws, and any amendments thereto, which shall become effective when—

> (1) ratified by a majority vote of the adult members of the tribe or tribes at a special election authorized and called by the Secretary under such rules and regulations as the Secretary may prescribe; and

> (2) approved by the Secretary pursuant to subsection (d) of this section.

25 U.S.C. § 476(a). Pursuant to subsection (a)(1), the Secretary has promulgated several rules governing special elections. *See generally* 25 C.F.R. pt. 81. Compliance with these rules is a prerequisite for the Secretary's approval of a proposed constitution. Among other things, the rules define voter eligibility, *id.* § 81.6, create tribal-election boards, *id.* § 81.8, establish voting districts, *id.* § 81.9, describe voter-registration procedures, *id.* § 81.11, stipulate conditions for election notices, *id.* § 81.14, set poll opening and closing times, *id.* § 81.15, and describe the criteria for ballots, *id.* § 81.20. According to subsection (d)(1), once shown that the proposed constitution is the product of the § 476(a) process, the Secretary "shall approve the constitution [] within forty-five days after the election unless the Secretary finds that the proposed constitution [is] contrary to applicable laws." 25 U.S.C. § 476(d)(1).[4]

---

[4] "[A]pplicable laws" means "any treaty, Executive order or Act of Congress or any final decision of the Federal courts which are applicable to the tribe, and any other laws which are applicable to the tribe pursuant to an Act of Congress or by any final decision of

6

Section 476(h) provides a second way to seek the Secretary's approval for a proposed constitution. Unlike the extensive procedural requirements of § 476(a), under § 476(h) a tribe may adopt a constitution using procedures of its own making:

> Notwithstanding any other provision of this Act each Indian tribe shall retain inherent sovereign power to adopt governing documents under procedures other than those specified in this section[.]

25 U.S.C. § 476(h)(1). But this greater flexibility in process comes with a cost. Section 476(h) does not provide a safe harbor. As discussed in detail in Part III, the central issue in this case is the extent of the Secretary's power to approve a constitution under this section.

## II.

CVM is a federally recognized Indian tribe. *See* Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs, 70 Fed. Reg. 71,194, 71,194 (Nov. 25, 2005). It has a potential membership of 250,[5] but its current tribal council—led by Burley—was

---

the Federal courts." Act of Nov. 1, 1988, Pub. L. No. 100-581, § 102(1), 102 Stat. 2938, 2939.

[5] This figure was offered by the tribe itself in separate litigation. *See* Complaint for Injunctive and Declaratory Relief at 1, California Valley Miwok Tribe v. United States, No. 02-0912 (E.D. Cal. Apr. 29, 2002). We take judicial notice of that document. *See Veg-Mix, Inc. v. U.S. Dep't of Agric.*, 832 F.2d 601, 607 (D.C. Cir. 1987).

handpicked by only a tiny minority.[6] This case is the latest round of sparring between Burley and the federal government over whether the tribe is organized under the Act. Burley's efforts to organize the tribe began in 2000 when, pursuing the safe harbor procedure of § 476(a), she and a group of her supporters adopted a constitution and requested the Secretary to call an election for its ratification. Section 476(c) required the Secretary to call an election on the proposed constitution within 180 days. For reasons not apparent from the record, the Secretary never called the election. Rather than press the matter, Burley withdrew her request for a vote on the constitution.

A second effort to organize came in 2001, when Burley's group adopted a new constitution for the tribe. This time, Burley bypassed the § 476(a) process and instead sent the constitution directly to the Secretary for approval. The Secretary informed her that the constitution was defective and the tribe still unorganized.

Perhaps relying on the old adage, Burley made a third attempt in early 2004. Meanwhile, Congress passed the Native American Technical Corrections Act, which added § 476(h). The Secretary then responded to Burley by rejecting her proposed constitution and explaining that she would need to at least attempt to involve the entire tribe in the

---

[6] In 1999, the Secretary recognized Burley as CVM's chairperson. The Secretary also entered into a "self-determination contract" with the tribe under the Indian Self-Determination Act. *See* 25 U.S.C. § 450f. Pursuant to that contract, the tribe received funds for the development of its government. Subsequently, however, the Secretary modified her stance and recognized CVM's leadership only on an interim basis, pending the tribe's organization effort. Burley does not challenge this change.

organizational process before the Secretary would give approval:

> Where a tribe that has not previously organized seeks to do so, [the Secretary] also has a responsibility to determine that the organizational efforts reflect the involvement of the whole tribal community. We have not seen evidence that such general involvement was attempted or has occurred with the purported organization of your tribe. . . . To our knowledge, the only persons of Indian descent involved in the tribe's organization efforts, were you and your two daughters.

Letter from Dale Risling, Sr., Superintendent, United States Department of the Interior, Bureau of Indian Affairs-Cent. Cal. Agency, to Silvia Burley (Mar. 26, 2004).

Burley, in CVM's name, then sued the United States for its failure to recognize the tribe as organized. She also twice motioned for leave to file supplemental claims for relief. The district court dismissed the original complaint for failure to state a claim and also denied the motions for leave.

We review the grant of a motion to dismiss *de novo*. *Broudy v. Mather*, 460 F.3d 106, 116 (D.C. Cir. 2006). Although Burley initially filed two claims for relief—one under § 476(h) of the Act and the other under the Administrative Procedure Act ("APA"), 5 U.S.C. § 704—we review only the APA claim because § 476(h) offers no private cause of action. We review the denial of leave to file supplemental claims for abuse of discretion. *Hall v. CIA*, 437 F.3d 94, 101 (D.C. Cir. 2006).

**III.**

The Burley faction has chosen not to repeat its effort to organize under § 476(a). Instead, it has tried to organize under § 476(h). Burley argues that, under § 476(h), the Secretary had no choice but to approve the proposed constitution. The Secretary reads § 476(h) to allow her to reject any constitution that does not "reflect the involvement of the whole tribal community." We consider the question within the framework of *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). The Secretary's legal interpretation did not come in either a notice-and-comment rulemaking or a formal adjudication, the usual suspects for *Chevron* deference. We nonetheless believe that *Chevron*—rather than *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)—provides "the appropriate legal lens through which to view the legality of the Agency interpretation," *Barnhart v. Walton*, 535 U.S. 212, 222 (2002), because of the "interstitial nature of the legal question" and the "related expertise of the Agency," *id.* We must therefore determine whether Congress has spoken directly to the issue. If it has not, we must defer to the agency's interpretation as long as it is reasonable. *Chevron,* 467 U.S. at 842–43. We hold that the Secretary's interpretation is a permissible one.[7]

---

[7] We recognize that we typically do not apply full *Chevron* deference to an agency interpretation of an ambiguous statutory provision involving Indian affairs. In the usual circumstance, "[t]he governing canon of construction requires that 'statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit.' " *Cobell v. Norton*, 240 F.3d 1081, 1101 (D.C. Cir. 2001) (quoting *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985)). "This departure from the *Chevron* norm arises from the fact that the rule of liberally construing statutes to the benefit of the Indians arises not from the ordinary exegesis, but 'from principles of equitable obligations and

Burley asserts that § 476(h) unambiguously requires the Secretary to approve any constitution adopted under that provision. In Burley's view, the Secretary has no role in determining whether a tribe has properly organized itself to qualify for the federal benefits provided in the Act and elsewhere. That cannot be. Although the sovereign nature of Indian tribes cautions the Secretary not to exercise freestanding authority to interfere with a tribe's internal governance, the Secretary has the power to manage "*all* Indian affairs and [] *all* matters *arising out of Indian relations*." 25 U.S.C. § 2 (emphases added).[8] We have previously held that this extensive grant of authority gives the Secretary broad power to carry out the federal government's unique responsibilities with respect to Indians. *See Udall v. Littell*, 366 F.2d 668, 672 (D.C. Cir. 1966) ("In charging the Secretary with broad responsibility for the welfare of Indian tribes, Congress must be assumed to have given [her] reasonable powers to discharge it effectively."); *see also United States v. Eberhardt*, 789 F.2d 1354, 1359 (9th Cir.

---

normative rules of behavior,' applicable to the trust relationship between the United States and the Native American people." *Id.* (quoting *Albuquerque Indian Rights v. Lujan*, 930 F.2d 49, 59 (D.C. Cir. 1991)). Here, however, the Secretary's proposed interpretation does not run against any Indian tribe; it runs only against one of the contestants in a heated tribal leadership dispute, *see supra* note 1. In fact, as we later explain, the Secretary's interpretation actually advances "the trust relationship between the United States and the Native American people." Therefore, adherence to *Chevron* is consistent with the customary Indian-law canon of construction.

[8] This grant of authority was initially lodged in the Secretary of War. *See* Act of July 9, 1832, ch. 174, § 1, 4 Stat. 564. It was eventually transferred to the Secretary of the Interior in 1849. *See* Act of Mar. 3, 1849, ch. 108, § 5, 15 Stat. 228.

1986) (noting that § 2 serves "as the source of Interior's plenary administrative authority in discharging the federal government's trust obligations to Indians"). The exercise of this authority is especially vital when, as is the case here, the government is determining whether a tribe is organized, and the receipt of significant federal benefits turns on the decision.

The Secretary suggests that her authority under § 476(h) includes the power to reject a proposed constitution that does not enjoy sufficient support from a tribe's membership. Her suggestion is reasonable, particularly in light of the federal government's unique trust obligation to Indian tribes. *See Seminole Nation v. United States*, 316 U.S. 286, 296 (1942) (noting "the distinctive obligation of trust incumbent upon the Government in its dealings with" tribes). A cornerstone of this obligation is to promote a tribe's political integrity, which includes ensuring that the will of tribal members is not thwarted by rogue leaders when it comes to decisions affecting federal benefits. *See id.* at 297 ("Payment of funds at the request of a tribal council which, to the knowledge of the Government officers charged with the administration of Indian affairs . . . , was composed of representatives faithless to their own people and without integrity would be a clear breach of the Government's fiduciary obligation."); *Seminole Nation v. Norton*, 223 F. Supp. 2d 122, 140 (D.D.C. 2002) (noting that the Secretary "has the responsibility to ensure that [a tribe's] representatives, with whom [she] must conduct government-to-government relations, are valid representatives of the [tribe] *as a whole*") (emphasis added).

The sensibility of the Secretary's understanding of § 476(h) is especially apparent in a case like this one. Although CVM, by its own admission, has a potential membership of 250, only Burley and her small group of supporters had a hand in adopting her proposed constitution.

This antimajoritarian gambit deserves no stamp of approval from the Secretary. As Congress has made clear, tribal organization under the Act must reflect majoritarian values. *See* 25 U.S.C. § 476(a) (requiring majority vote by tribe for adoption of a constitution); *id.* § 476(b) (requiring majority vote by tribe for revocation of a constitution); *id.* §§ 478, 478a (requiring majority vote by tribe in order to exclude itself from the Act). And as we have previously noted, tribal governments should "fully and fairly involve the tribal members in the proceedings leading to constitutional reform." *Morris v. Andrus*, 640 F.2d 404, 414 (D.C. Cir. 1981). Because the Secretary's decision not to approve Burley's proposed constitution was permissible, we affirm the dismissal of Burley's claim.

Burley also argues that the district court abused its discretion by denying her motions for leave to file supplemental claims. *See* FED. R. CIV. P. 15(d). Any such error was harmless. *See* FED. R. CIV. P. 61. Because there has been no fact development in this case, no harm is done by requiring Burley to file her supplemental claims in a new cause of action. *See* 6A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 1506, at 197 (2d ed. 1990) (noting that "when joinder will not promote judicial economy or the speedy disposition of the dispute between the parties, refusal to allow the supplemental pleading is entirely justified").

For the foregoing reasons, the judgment of the district court is

*Affirmed.*