**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| TIFFANY L. AGUAYO, (HAYES); KAREN DURO, (RENIO); ROSA ESTRADA; CHRISTIAN GRIFFITH; JUSTIN GRIFFITH; NATASHA GRIFFITH; CAMERON C. HAYES; PAMELA KENNEDY; ELIZABETH MARTINEZ; JACQUELINE MCWHORTER; DAWN MOJADO; PRISCILLA MOJADO; MICHAEL PERALTA; JOHNNY POLING; JESSICA RENTERIA; ADAM TRUJILLO; ANDREA TRUJILLO; ANNALEE H. TRUJILLO, (YANEZ); BRADLEY L. TRUJILLO, JR.; BRANDON M. TRUJILLO, SR.; BRIAN A. TRUJILLO, II; CHARLES TRUJILLO; DONALD TRUJILLO; JENNIFER TRUJILLO; JOHN A. TRUJILLO; JONATHAN TRUJILLO; JOSHUA E. TRUJILLO; KRISTINE TRUJILLO; LAURA J. TRUJILLO; LESLIE TRUJILLO; MARLENE TRUJILLO; RANDOLPH W. TRUJILLO, JR.; SHALAH M. TRUJILLO; TINA TRUJILLO-POULIN; ANNETTE E. WALSH; BRENDA J. WALSH; ERIC J. WALSH; PATRICIA A. WALSH; STEPHANIE S. WALSH; JUANITA LUNA; LANISE LUNA; SHALEA LUNA; ANTHONY LUNATRUJILLO; BRIAN | No. 14-56909 <br><br> D.C. No. 3:13-cv-01435-BAS-KSC <br><br><br> OPINION |

TRUJILLO, SR.; JACOB TRUJILLO;
MIRIAM TRUJILLO; RACHEL ELLIS-
TRUJILLO; REBEKAH TRUJILLO;
RICHARD TRUJILLO; MICHELLE
TRUJILLO; BRIANNA MENDOA;
ANGEL MORALES; DESTINY PENA;
MARI PENA; ROGELIO PENA;
GERONIMO POLING; KRISTA POLING;
KRISTOPHER POLING; CHEYENNE
TRUJILLO; PETER TRUJILLO, JR.;
BRANDON TRUJILLO, JR.; FEATHER
TRUJILLO; MUKIKMAL TRUJILLO;
TASHPA TRUJILLO; KAWISH
TRUJILLO; SUSANNE WALSH; JOSEPH
RAVAGO; KALEY RAVAGO,
                        *Plaintiffs-Appellants*,

v.

S.M.R. JEWELL, Secretary,
Department of the Interior; KEVIN K.
WASHBURN, Esquire, Assistant
Secretary, Department of the Interior
- Indian Affairs; AMY DUTSCHKE,
Regional Director, Department of
the Interior; ROBERT EBEN,
Superintendent of the Department of
Indian Affairs, Southern California
Agency; DOES, 1 THROUGH 10,
                        *Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of California
Cynthia A. Bashant, District Judge, Presiding

Argued and Submitted February 5, 2016
Pasadena, California

Filed July 8, 2016

Before: STEPHEN REINHARDT, RICHARD A. PAEZ,
and MILAN D. SMITH, JR., Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.

## SUMMARY[*]

### Indian Law

Affirming the district court's summary judgment in favor of the defendants, the panel held that the Bureau of Indian Affairs did not act arbitrarily and capriciously when it concluded that, according to tribal law, it had no authority to intervene in a tribal membership dispute, in which more than 150 people were disenrolled from the Pala Band of Mission Indians.

The panel held that it had jurisdiction to review the BIA's final agency action under the Administrative Procedures Act.

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that the BIA was not arbitrary and capricious in concluding that the Pala Band's 1997 Constitution and 2009 enrollment ordinance supplanted the Band's Articles of Association and 1961 membership ordinance. Accordingly, the BIA had only an advisory role and could not compel the Band's Executive Committee to re-enroll the plaintiffs. The panel rejected plaintiffs' argument that the BIA had an independent trust duty to protect them from unjust disenrollment.

## COUNSEL

Tracy L. Emblem (argued), Escondido, California, for Plaintiffs-Appellants.

John L. Smelter (argued), Reuben S. Schifman, and Katherine J. Barton, Attorneys; John C. Cruden, Assistant Attorney General; United States Department of Justice, Environment & Natural Resources Division, Washington, D.C.; Barbara N. Coen, Office of the Solicitor, United States Department of the Interior, Washington, D.C., for Defendants-Appellees.

## OPINION

M. SMITH, Circuit Judge:

This appeal analyzes whether the Bureau of Indian Affairs (BIA) acted arbitrarily and capriciously when it concluded that, according to tribal law, it had no authority to intervene in a tribal membership dispute, in which more than 150 people were disenrolled from the Pala Band of Mission Indians (Pala Band or Band). We conclude that it did not, and affirm the decision of the district court.

## FACTS AND PROCEDURAL BACKGROUND

The Pala Band is a federally-recognized Indian tribe located in northern San Diego County. The Secretary of the Interior created the Pala Reservation in the late nineteenth century, pursuant to the Mission Indian Relief Act of 1891. *See Escondido Mut. Water Co. v. Fed. Energy Regulatory Comm'n*, 692 F.2d 1223, 1225 (9th Cir. 1982), *rev'd in part on other grounds by Escondido Mut. Water Co. v. La Jolla Band of Mission Indians*, 466 U.S. 765 (1984).

In 1934, Congress passed the Indian Reorganization Act (IRA). Indian Reorganization Act, ch. 576, 48 Stat. 984 (1934) (codified as amended at 25 U.S.C. §§ 461–479). The IRA granted each Indian tribe "the right to organize for its common welfare, and . . . adopt an appropriate constitution and bylaws," to be approved by the Secretary of the Interior. 25 U.S.C. § 476(a). By its terms, the IRA does not apply to reservations "wherein a majority of the adult Indians, voting at a special election duly called by the Secretary of the Interior, shall vote against its application." *Id.* § 478. The Secretary of the Interior was directed to call such an election

"within one year after June 18, 1934." *Id.* The Secretary called such an election, and the Pala Band voted against adopting the IRA on December 18, 1934. Theodore Haas, *Ten Years of Tribal Government Under I.R.A.*, 14 (U.S. Indian Serv. 1947).

## I. Articles of Association

Notwithstanding its decision to vote against the IRA in 1934, the Pala Band chose to organize its government. In 1960, it adopted Articles of Association as the Band's governing document. The Articles created an Executive Committee, comprised of six elected officers, and a General Council, which included all adult members of the tribe. The Articles granted the General Council the power "[t]o enact ordinances . . . governing future membership, loss of membership and adoption of members into the Band."

Shortly thereafter, the General Council enacted a membership ordinance (the 1961 Ordinance), pursuant to the authority granted to it in the Articles. Under the 1961 Ordinance, a person seeking membership in the Band would apply to the Executive Committee, which would make a report and recommendation to the Regional Director of the BIA. If the Band recommended denying the application, the applicant could appeal to the Regional Director, who would then make a recommendation, and send a report to the Commissioner of the BIA. If the Commissioner was satisfied that the applicant met the enrollment criteria, he was to "notify the appellant in writing and the Executive Committee shall enter the applicant's name on the membership roll." In other words, pursuant to the Articles of Association and the 1961 Ordinance, the Executive Committee made

recommendations, but the BIA was granted ultimate authority over whether an applicant was enrolled.

Plaintiffs are descendants of Margarita Britten (Margarita), a Pala Indian who was born in 1856. Their eligibility to be enrolled as members of the Pala Band depends on whether Margarita was a full- or half-blooded Pala Indian.[1] Margarita was originally considered to be one-half Pala Indian, and thus her great-great-grandchildren did not have the minimum 1/16 blood quantum to be eligible for membership in the Band.

The first eligibility dispute regarding Margarita's descendants proceeded pursuant to the 1961 Ordinance. In 1984, the General Council concluded that the evidence suggesting that Margarita was actually a full-blooded Pala Indian was more accurate, and voted to change her status accordingly. The General Council's recommendation was sent to a BIA Regional Director, Tom Dowell, who recommended against enrolling her descendants because there was insufficient evidence to establish Margarita's blood quantum. Director Dowell's decision was appealed to the Assistant Secretary-Indian Affairs in 1989, who reversed that finding and concluded that Margarita should be considered a full-blooded Pala Indian. Pursuant to the 1961 Ordinance, the Executive Committee was then compelled to add Margarita's

---

[1] Margarita's blood quantum depends upon the identity and lineage of her father. The evidence on this issue is somewhat conflicting. For instance, a reconstructed version of the original membership roll lists Margarita as a full-blooded Pala Indian, but a copy with pen-and-ink edits changed her designation to one-half Pala Indian. Likewise, some records indicate that Margarita's father was "unknown," but available probate testimony from a proceeding in the 1920s suggests that her father was known, and that he was a full-blooded Pala Indian.

great-great-grandchildren, with the requisite 1/16 blood quantum, to the Band's membership rolls.

## II.  Pala Constitution

On November 22, 1994, the Pala Band held a general election in which the tribe voted to adopt a new constitution to supplant the Articles of Association. The Pala Band submitted the Constitution to the BIA for approval in March 1995. The most relevant change was that the six-member Executive Committee (not the General Council) would have authority to "amend and/or replace its existing Enrollment Ordinance with an Ordinance governing adoption, loss of membership, disenrollment, and future membership." The agency recommended some changes, and the final version of the Constitution was completed in 1997. The Constitution provided that it would "become effective immediately after its approval by a majority vote of the voters voting in a duly-called elections [sic] at which this Constitution is approved by the Bureau of Indian Affairs."

On November 19, 1997 at a special meeting, with a quorum of the General Council present, the Council passed Resolution 97-36 to "adopt the Pala Tribal Constitution to supersede the Articles of Association." The resolution noted in a preambulatory clause that "on November 22, 1994" the tribe had voted to "revise the Pala Tribal Articles of Association into the Pala Tribal Constitution," suggesting that the vote in 1994 was sufficient to approve the new Constitution.

The Band submitted the 1997 Constitution to the Regional Director of the BIA, who recommended further changes.[2] In a letter, the Regional Director noted that "[b]ased on a recent opinion by the Regional Solicitor of a non-IRA Tribe's document, it was determined that Bureau review and approval was not required." She also noted that "the Pala General Council had already adopted the constitution by resolution dated 11/19/97," suggesting that in the BIA's estimation, Resolution 97-36 was sufficient to adopt the Constitution. Nonetheless, the Regional Director wrote that if the Band decided to incorporate the BIA's recommendations and changes, the BIA would approve it retroactive to the date of Resolution 97-36. The Chairman of the Executive Committee responded that the Band did not want to incorporate the BIA's suggestions, but would like to have the Constitution immediately approved nonetheless. On July 25, 2000, the BIA issued a Certificate of Approval stating that the "Constitution of the Pala Band of Mission Indians is hereby approved retroactive to the date of adoption on November 12[3], 1997."

---

[2] One of the suggested changes proved to be a prescient warning. The Regional Director noted that "when the governing body of the tribe delegates totally the enactment of governing documents to its executive body, problems may occur causing internal disputes. In adhering to the governmental principle of checks and balances between the General Council and the Executive Committee, it is recommended that the General Council *not* delegate the enactment of Ordinances to the Executive Committee." (Emphasis added).

[3] This date appears to be erroneous; Resolution 97-36 was passed on November 19, 1997. The Regional Director's previous letter reflects the correct date.

There is some dispute concerning whether the general tribal membership had notice that the 1997 Constitution was the new governing document of the tribe. The Pala Band appears to have been less than meticulous in using the correct terminology to refer to the governing documents; for example, the Band's website in 2012 stated that it was organized under "Articles of Association." However, the facts indicate that in the years following Resolution 97-36, the tribal membership was at least on constructive notice that the Constitution had been adopted.

As an initial matter, Resolution 97-36 was voted on during a meeting of the General Council, at which a quorum was present. Every adult member of the tribe is a member of the General Council; it is comprised of the same group of people that would have been eligible to vote on the Constitution in a more formalized election. The meeting was announced prior to its occurrence. Minutes were taken of that meeting, and Plaintiffs do not allege that they were unable to access records of the meeting, Resolution 97-36, or the 1997 Constitution.

Additionally, subsequent references and amendments to the Constitution indicate that the general membership was on notice of the Constitution. In another General Council meeting on June 11, 2003, a member offered a motion that "at eighteen (18) you get a copy of [the] Tribal Constitution." The General Council voted in favor of the motion, and the minutes reflect "Action Instructions" to "send [a] copy to all Tribal Members eighteen (18) and over."

In a meeting on July 14, 2004, the General Council meeting minutes reflect that "motions were passed by the General Council" to put "Constitutional Amendments" on the

ballot. Those amendments included changes to the term limits, qualifications, and residency requirements for members of the Executive Committee. The minutes reflect that in an "election," the Band had voted to adopt those "Amendments to the Pala Constitution."

## III.    The 2009 Ordinance

Pursuant to its authority under the 1997 Constitution, the Executive Committee adopted a new enrollment ordinance in 2009 (the 2009 Ordinance) to replace the 1961 Ordinance. Its prefatory language stated that the Committee did "not intend to alter or change the membership status of individuals whose membership has already been approved and who are currently listed on the membership roll of the Pala Band." Nevertheless, the operative language of the 2009 Ordinance gave the Executive Committee the power to "reevaluate" an applicant based on "misrepresented or omitted facts that might have made him/her ineligible for enrollment," and remove such members from the rolls. A person who has received an adverse decision from the Executive Committee may "appeal" to the Regional Director, who is tasked with reviewing the decision and making a "recommendation" to the Executive Committee. After receiving the recommendation, "the Executive Committee shall meet and consider that recommendation and make a final decision on the appeal of [the] decision. The decision of the Executive Committee shall be final." Thus, the 2009 Ordinance gave the Executive Committee ultimate authority over enrollment decisions, and relegated the BIA to an advisory role.

## IV.    Plaintiffs' Disenrollment

In June 2011, the Executive Committee revisited the enrollments of eight of Margarita's great-great-grandchildren "at the request of Pala tribal members," invoking its authority pursuant to the 2009 Ordinance. It concluded that those eight descendants should be disenrolled, citing the 1985 recommendation of former Regional Director Dowell, who concluded that there was insufficient evidence to declare Margarita a full-blooded Pala Indian. Shortly thereafter, the Executive Committee sent similar disenrollment notices to 150 of Margarita's descendants. The notices stated that an appeal could be filed with the Regional Director.

The first eight members to be disenrolled appealed to the Regional Director, who recommended that the Band reverse its decision. However, the Regional Director noted that she only had advisory authority under the 2009 Ordinance. A few months later, the Regional Director made a substantively identical recommendation with regard to the remaining individuals who had been disenrolled. The Executive Committee did not follow the Regional Director's recommendations to re-enroll Margarita's descendants.

The Assistant Secretary - Indian Affairs (AS-IA) affirmed, concluding that "applicable tribal law established a limited role for the Regional Director to make recommendations on tribal action on enrollment appeals, but the law reserves ultimate decision-making authority with the Band." In reaching this conclusion, the AS-IA rejected Plaintiffs' arguments that the 1997 Constitution, which provided the basis for the 2009 Ordinance granting enrollment authority to the Executive Committee, was void. He concluded that any challenge to the agency's approval of

the 1997 Constitution was time-barred, since more than six years had passed since the BIA's approval of it in 2000. The AS-IA also determined that even if a challenge was not time-barred, the agency was nevertheless correct when it chose to tread lightly and not overly scrutinize the procedures used by the tribe to ratify the Constitution in order to "avoid[] unnecessary intrusion in tribal self-governance." The AS-IA accepted the Band's position that Resolution 97-36, adopted at a General Council meeting with a quorum present, was a sufficient "election" to adopt the Constitution. In the alternative, the AS-IA concluded that the general election in November 1994, when the tribe approved the adoption of a constitution, was sufficient to make the 1997 Constitution the valid governing document of the tribe.

Because he had concluded that the 1997 Constitution was valid, the AS-IA did not reach the merits of Plaintiffs' claim that the Executive Committee wrongly disenrolled them. The AS-IA affirmed the Regional Director's reasoning that under the 2009 Ordinance, the BIA did not have authority to compel the Executive Committee to change its decision. Finally, the AS-IA declined to add two minor children to the agency appeal, because they had not sought relief from the Regional Director, and therefore their claims were not "within the scope of the issues pending" in the agency appeal.

Sixty-five of the disenrolled members then commenced a declaratory relief action in district court against the Secretary of the Interior, the AS-IA, the Regional Director, and other federal officials. They invoked 5 U.S.C. § 706(2)(A), alleging that the AS-IA's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." The district court granted summary judgment for Defendants, holding that the agency did not act

arbitrarily or capriciously with respect to any of its decisions. Plaintiffs then filed this timely appeal.

## ANALYSIS

"We review de novo the district court's grant of summary judgment." *Chemeheuvi Indian Tribe v. Jewell*, 767 F.3d 900, 903 (9th Cir. 2014). "Summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (citing Fed. R. Civ. P. 56(a)).

The propriety of the BIA's "hands-off" approach hinges on whether the Articles of Association and the 1961 Ordinance continue to govern the Band and its membership disputes. If they do, the BIA has the authority to make final decisions with regard to enrollment in the Band. On the other hand, if those documents were supplanted by the 1997 Constitution and 2009 Ordinance, the BIA only has an advisory role and cannot compel the Executive Committee to re-enroll Plaintiffs.

In this appeal, Plaintiffs argue that the BIA's conclusion that the 1997 Constitution and 2009 Ordinance were the governing law to be applied was arbitrary and capricious; that the federal government's general trust responsibility toward Native Americans requires the BIA to take action to protect Plaintiffs and their membership rights; and that the 1989 decision by the AS-IA, which ruled that Margarita was a full-blooded Pala Indian, has binding and preclusive effect on the Band. They also challenge the AS-IA's decision not to join the two minors in the agency appeal.

In response, Defendants argue that we are without jurisdiction to review the AS-IA's decision at all, because tribal disputes are generally beyond federal adjudication, and because any decision made by the AS-IA was committed to agency discretion by law. They also defend the AS-IA's decision regarding the applicability of the 1997 Constitution on the merits.

We consider the contentions of the parties in turn.

## I.  Jurisdiction and Standard of Review

Defendants contend that we do not have jurisdiction to review this case because federal courts cannot adjudicate tribal membership decisions, and in the alternative, because the AS-IA's decision was committed to agency discretion by law. We find neither argument meritorious.

### A.  Tribal Membership Disputes

Tribal enrollment decisions are generally beyond the power of federal courts to review. "A tribe's right to define its own membership for tribal purposes has long been recognized as central to its existence as an independent political community." *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 72 n.32 (1978). Tribes are "immune from federal court jurisdiction in disputes regarding challenges to membership in the tribe," and may not be sued for a reversal of an intratribal membership enrollment decision. *Lewis v. Norton*, 424 F.3d 959, 961 (9th Cir. 2015).

Nor may a plaintiff make an "end run" around tribal sovereign immunity by simply naming a federal agency in a lawsuit instead of a tribe. *Id.* at 963. In *Lewis*, after a tribe

denied the plaintiffs' application for enrollment, the plaintiffs immediately filed an action for declaratory and injunctive relief against the BIA in the district court. *Id.* at 961. That action sought an order instructing the BIA to compel the tribe to enroll the plaintiffs. *Id.* The plaintiffs had not sought any relief from the BIA before filing suit. *See id.* at 963. The court held that this was a transparent effort "to do an end run around sovereign immunity," and again held that federal courts have no jurisdictional basis to directly review a tribe's enrollment decisions. *Id.*

A different scenario arises when a suit is not a direct challenge to a tribe's enrollment decision, but is instead a challenge to agency action under the Administrative Procedures Act (APA), 5 U.S.C. §§ 500–596. When a plaintiff has previously sought relief from the BIA, federal jurisdiction is proper to the extent that the plaintiff seeks review of the agency's decision "under the APA's arbitrary and capricious standard." *Alto v. Black*, 738 F.3d 1111, 1123 (9th Cir. 2013).

A factual pattern similar to the one before us here arose in *Cahto Tribe of Laytonville Rancheria v. Dutschke*, 715 F.3d 1225 (9th Cir. 2013). The Cahto Tribe's General Council voted to disenroll twenty-two tribal members. *Id.* at 1226. One of the disenrolled members appealed to the Regional Director, who "directed the Tribe to place the disenrolled members back on the membership roll." *Id.* at 1227. As in this case, the merits of *Cahto Tribe* focused upon whether the tribe's governing documents authorized the BIA to compel the tribe to re-enroll the plaintiffs. *Id.* at 1228. On appeal, we held that the federal courts had jurisdiction to review the BIA's decision, including the question of whether the BIA had jurisdiction under tribal law to review the

disenrollment decisions. *Id.* In *Alto*, we made explicit what was implicit in *Cahto Tribe*: that the propriety of agency action is a federal question over which we have jurisdiction, even where the agency applied tribal law in the context of a membership dispute. 738 F.3d at 1123–25.

## B. Application of the APA

"[F]inal agency action for which there is no other adequate remedy in a court [is] subject to judicial review." 5 U.S.C. § 704. Judicial review under the APA is not proper, however, if the "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). The APA creates a "strong presumption that Congress intends judicial review of administrative action." *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670 (1986). The question is whether the AS-IA's decision is a "final agency action," and whether that agency action is "committed to agency discretion by law."

### 1. Final Agency Action

The AS-IA did not take affirmative action to compel the Band to re-enroll Plaintiffs; instead, it declined to intervene on behalf of Plaintiffs in the enrollment dispute. Defendants contend that because the AS-IA *failed* to act in the Plaintiffs' interest, its decision does not constitute "final agency action" from which legal consequences will flow. This is incorrect. Under the APA, we have jurisdiction to review more than just affirmative agency action. "Agency action" in the statute "includes the whole or part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13); *see* 5 U.S.C. § 701(b)(2) (referring to section 551 for the definition of "agency

action"). The BIA's "denial" of relief to Plaintiffs, and its "failure to act" on their behalf, is a "final agency action" subject to judicial review.

## 2. Committed to Agency Discretion by Law

Judicial review of a final agency action is not proper if the "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2); *Heckler v. Chaney*, 470 U.S. 821, 828 (1985) ("[B]efore any review at all may be had, a party must first clear the hurdle of § 701(a)."). The Supreme Court "has cautioned that this exception is very narrow, and is applicable only where statutes are drawn so broadly 'that there is no law to apply.'" *Moapa Band of Paiute Indians v. U.S. Dep't of Interior*, 747 F.2d 563, 565 (9th Cir. 1984) (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410 (1971)). "Preclusion of judicial review is not lightly inferred, and usually will not be found absent a clear command of the statute." *Id.* (citing *Barlow v. Collins*, 397 U.S. 159, 166–67 (1970)).

At oral argument, Defendants contended that the reason there is "no law to apply" is because the IRA, with its prescribed procedures for enacting tribal governing documents, does not apply to the Pala Band. Instead, the AS-IA acted according to the agency's general powers over Indian affairs. The BIA's enabling statute gives the Commissioner of Indian Affairs (under the direction of the Secretary of the Interior) the "management of all Indian affairs and of all matters arising out of Indian relations." 25 U.S.C. § 2. Thus, Defendants contend that because the enabling statute is so general, there is "no law to apply" and their actions are "committed to agency discretion by law."

We agree that the IRA does not apply to the Pala Band and thus, to the extent Plaintiffs rely upon language from that statute to support their position, they are in error. However, we disagree that the enabling power in 25 U.S.C. § 2 is so broad (and so unmoored from any legal standards) that the BIA's discretion under that section is unreviewable.

### a.  Application of the IRA

In the early twentieth century, the federal government's policy toward Native American tribes encouraged individual land ownership and assimilation of Native Americans into general American society. *See Bugenig v. Hoopa Valley Tribe*, 266 F.3d 1201, 1205 (9th Cir. 2001) (en banc). That approach was unsuccessful, and Congress changed its policy to instead promote tribal sovereignty and self-government, principally through the passage of the IRA. *Id.*

Plaintiffs draw upon the IRA because it includes procedures for tribes to adopt governing documents, and for the Secretary of the Interior to approve them.[4] *See* 25 U.S.C. § 476. A tribe may adopt a constitution "at a special election authorized and called by the Secretary," according to rules promulgated by the agency. 25 U.S.C. § 476(a). If it does so, the Secretary "shall" approve the constitution unless she finds

---

[4] At oral argument, Plaintiffs argued that in order for a governing document to be validly approved, it must be approved by the Secretary personally. Plaintiffs offered no authority supporting this contention. The BIA's enabling statute specifically authorizes the Secretary to "delegate, from time to time, . . . [her] powers and duties . . . to the Commissioner of Indian Affairs," who is in turn authorized to "delegate, in like manner . . . to the assistant commissioners, or the officer in charge of any branch, division, office, or agency of the Bureau of Indian Affairs." 25 U.S.C. § 1a.

that it is "contrary to applicable laws." *Id.* § 476(d). A tribe also "retain[s] inherent sovereign power to adopt governing documents under procedures other than those specified" by the agency. *Id.* § 476(h). Tribes that adopt constitutions pursuant to other procedures are not guaranteed approval by the Secretary, but the Secretary has discretion to approve them nonetheless. *See Cal. Valley Miwok Tribe v. United States*, 515 F.3d 1262, 1266–67 (D.C. Cir. 2008). The Secretary properly exercises discretion not to approve a governing document when it does not "reflect the involvement of the whole tribal community." *Id.*

However, the IRA, including the provision requiring Secretarial approval of organizational documents, does not automatically apply to all federally-recognized tribes. By its terms, it does not apply to reservations "wherein a majority of the adult Indians, voting at a special election duly called by the Secretary of the Interior, shall vote against its application." 25 U.S.C. § 478. The parties do not dispute that when the Pala Band held such an election in 1934, it voted *against* becoming an IRA tribe.

As noted, the Pala Band adopted governing documents in 1960, and worked with the BIA to approve them. However, such actions do not make the IRA applicable to the Band. In *United States v. Anderson*, 625 F.2d 910, 913–14 (9th Cir. 1980), a member of the Fort Peck Tribes argued that a provision of the IRA supported his position on a taxation issue. We rejected his argument on the ground that the IRA "does not apply to the Fort Peck Tribes" because they "voted against the Act." *Id.* at 916. Although they later chose to adopt a tribal constitution "and have since behaved and been treated by Interior exactly as if they were IRA tribes," the language of the IRA does "not disappear from our view

simply because the Interior chooses to wink." *Id.* We noted that if the Fort Peck Tribes "wish to be relieved from the effects of their negative vote, they must seek such relief from Congress." *Id.* Like the Fort Peck Tribes, the Pala Band appears to have been treated as if it was an IRA tribe for much of its history. However, the fact remains that the Band is not an IRA tribe, and the IRA, including any procedural protections for the adoption of governing documents, does not apply.

### b.  General Enforcement Power

Instead of acting pursuant to the IRA, the BIA acted under its broad powers over Indian affairs articulated in 25 U.S.C. § 2. ("The Commissioner of Indian Affairs shall, under the direction of the Secretary of the Interior . . . have the management of all Indian affairs and of all matters arising out of Indian relations."). Defendants argue that in choosing to respect the 1997 Constitution, the agency was making an executive, policy-based decision of one sovereign government recognizing another. Thus, they contend that their decision was "committed to agency discretion by law" because there is "no law to apply."

Defendants are correct that no specific *federal* law governed when reviewing the Executive Committee's decision. Nevertheless, the agency did review and apply tribal law. The Regional Director's letter concluded that the 2009 Ordinance "does provide authority to the Bureau of Indian Affairs to review and make a recommendation on enrollment appeals to the Executive Committee and does not provide [the] Bureau of Indian affairs the authority to decide enrollment appeals." The AS-IA made a threshold decision that the 1997 Constitution (and therefore the 2009 Ordinance)

were legitimate, but that too was based on an examination of tribal law. He noted that the 1997 Constitution must be approved at a "duly-called election[]," and analyzed whether a meeting of the General Council was a sufficient "election" according to the Articles of Association, the 1997 Constitution, and the Band's practice.

In *Alto*, we held that the BIA's decision on an enrollment issue is not "committed to agency discretion by law" where the agency must apply tribal law to reach its decision. 738 F.3d at 1124. In *Alto* the BIA proceeded, as here, under its "official capacity as a manager of Indian affairs under 25 U.S.C. § 2." *Id.* The tribal governing documents in *Alto* expressly incorporated federal regulations that required Secretarial approval of disenrollment decisions. *Id.* The court held that "by reason of that . . . incorporation, the Secretary's decision is not 'committed to agency discretion by law.' Rather, the Secretary must apply the tribe's own enrollment criteria." *Id.* (citation omitted). We held that the mere fact that "the substantive law to be applied in this case is tribal law does not affect our jurisdiction over an APA challenge to the BIA's decision." *Id.*

In this case, the BIA was not making a generalized decision about whether to recognize the Executive Committee as the legitimate government of the Band, untethered to any legal standard. At each level of agency review, it clearly applied tribal law to answer the same question at issue in *Alto* – whether "the tribe's own governing documents vest the [BIA] with ultimate authority over membership decisions." *Id.* at 1115. The exception to judicial review under the APA for actions that are "committed to agency discretion by law" does not apply, and we conclude that we have jurisdiction to review the agency's decision.

## II. Reasonableness of the AS-IA's decision

The APA requires that we set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The arbitrary and capricious standard of review is "highly deferential; the agency's decision is entitled to a presumption of regularity, and we may not substitute our judgment for that of the agency." *San Luis & Delta-Mendota Water Authority v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014) (internal quotation marks omitted).

"The rejection of an application for enrollment or the disenrollment of a tribal member by a tribal committee" may only be appealed to the BIA "when the tribal governing document provides for an appeal of the action to the Secretary." 25 C.F.R. § 62.4(a)(3). Plaintiffs argue that the AS-IA abused his discretion when he concluded that the 1997 Constitution was the valid governing document of the tribe, and that applicable tribal law did not authorize the agency to compel the Pala Band to re-enroll Plaintiffs. We disagree. The AS-IA reasonably decided that the statute of limitations precluded a direct challenge to the agency's approval of the 1997 Constitution; that the 1997 Constitution was validly adopted in any event; and that the current governing documents "established a limited role for the Regional Director to make recommendations on tribal action on enrollment appeals, but the law reserves ultimate decision-making authority with the Band."

Plaintiffs, in their agency appeal and in their case in federal court, insist that the 1997 Constitution was not validly adopted by the Band. By extension, they argue that the BIA should not have approved that Constitution in 2000, and

should not have relied upon that approval in the current enrollment dispute.

To the extent Plaintiffs' claims rely on directly challenging the BIA's 2000 decision, it is barred by the statute of limitations. "[E]very civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." 28 U.S.C. § 2401. This time bar applies to actions under the APA. *Wind River Min. Corp. v. United States*, 946 F.2d 710, 713 (9th Cir. 1991). The right of action generally accrues at the time the agency action becomes final. *See id.* at 715. There is a limited exception, however, when a plaintiff challenges the "substance of an agency decision as exceeding constitutional or statutory authority." *Id.* In that instance, the statute of limitations begins to run when the *ultra vires* agency action is adversely applied to the plaintiff. *Id.*

Plaintiffs challenge the "substance" of the 2000 approval, but they do not do so on the basis that the BIA's approval "exceed[ed] constitutional or statutory authority." *Id.* Their arguments are focused on whether the BIA should have accepted and approved a document that was not voted on by the Band in a formal election. Plaintiffs thus "protest the agency's action as a matter of policy or procedure," *id.*, and are subject to the six-year statute of limitations. Because their action was commenced twelve years after the BIA's 2000 approval was final, their challenge to that decision is time-barred.

However, even if Plaintiffs had challenged the BIA's retroactive approval of the 1997 Constitution within the statute of limitations, it is highly unlikely they would have been successful. The Regional Director in 2000 noted that

because the Pala Band was not an IRA tribe, "Bureau review and approval was not required" for the Band to adopt the 1997 Constitution as its governing document. In other words, the Band could have adopted the 1997 Constitution notwithstanding agency approval or disapproval.

Plaintiffs make the general argument that the AS-IA abused its discretion in its 2013 decision when it relied on the 1997 Constitution, which Plaintiffs argue is void as a matter of tribal law. But, as the AS-IA noted in his decision, there is at least some evidence that the 1997 Constitution was valid. The Articles of Association state that they may be "amended by a majority vote of the General Council and such amendment shall be in effect upon the approval of the Commissioner of Indian Affairs." It does describe formal "election" procedures in the context of electing members of the Executive Committee, referring to polling places and absentee ballots. But it does not define the term "election," or limit the type of "vote" or "election" that is required to amend or replace the Articles. In 1994, the Band as a whole voted in a formal election to replace the Articles of Association with a then to-be-drafted constitution.

The 1997 Constitution likewise does not define what constitutes a "duly-called election[]." After the General Council adopted Resolution 97-36, the Pala Band sent the 1997 Constitution to the Regional Director for approval, and represented that it had been "voted" on and "passed" by the Band. This indicates that, in the estimation of the Band's government, the General Council vote was sufficient to adopt the new constitution. The AS-IA noted that "[i]n practice . . . , the Articles of Association were amended at both meetings and at elections, as long as a quorum of 25 was present." He concluded that the Band "used these terms interchangeably."

Plaintiffs presented counter-evidence indicating that no sufficient "election" was held. They submitted a declaration from Elsie Lucero, a former BIA employee responsible for advising the Pala Band's enrollment committee. She asserted that in her "years of experience with the BIA, 'election' means tribal members are allowed to vote in a noticed, balloted election." She attested that the word "election" in the 1997 Constitution "means an established election ordinance, polling places, an election committee, and absentee ballots." Plaintiffs also submitted a declaration from King Freeman, a former member of the Executive Committee. He declared that "it was our custom and tradition that when there were to be major amendments contemplated to the Articles of Association, the Band always held a referendum election where all eligible voters had the right to vote by ballot." As a signer of Resolution 97-36, he represented that the resolution "was not meant to replace a future referendum election."

The procedures used to adopt the 1997 Constitution appear to be somewhat informal. However, when it comes to matters of tribal governance and membership, the AS-IA explained that the BIA generally maintains a hands-off approach, treading lightly to "avoid[] unnecessary intrusion in tribal self-governance." (Citing *Cheyenne River Sioux Tribe v. Aberdeen Area Dir.*, 24 IBIA 55, 62 (1993) and *Santa Clara Pueblo*, 436 U.S. at 60, 63). *See also Cal. Valley Miwok Tribe*, 515 F.3d at 1267 ("[T]he sovereign nature of Indian tribes cautions the Secretary not to exercise freestanding authority to interfere with a tribe's internal governance . . . ."). The claimed irregularities in tribal voting procedures are not the proper subject of exacting scrutiny by the BIA. Moreover, our review of the BIA's actions under the APA is in turn highly deferential; we decide only whether the

BIA's decision was based on a "clear error of judgment." *Gifford Pinchot Task Force v. United States Fish & Wildlife Serv.*, 378 F.3d 1059, 1065 (9th Cir. 2004). We conclude that the BIA does not commit a clear error of judgment when it can "state a rational connection between the facts found and the decision made." *Id.* The AS-IA's decision articulated a rational interpretation of the facts before him, and reasonably concluded that the 1997 Constitution was valid, notwithstanding the absence of a formal election, based on the language of the governing documents, and the past practice of the Band.

## III.    Trust Responsibility

Plaintiffs next argue that the BIA has an independent trust duty to protect them from unjust disenrollment. While there is unquestionably "a general trust relationship between the United States and the Indian people," *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 176 (2011) (internal quotation marks omitted), Plaintiffs have not persuaded us that the trust duty requires reversal of the agency's decision in this context.

Plaintiffs do not cite any authority suggesting an uncabined trust duty requiring the BIA to protect their membership rights at any cost. Plaintiffs rely heavily on *California Valley Miwok Tribe*, 515 F.3d 1262, for the proposition that the BIA has a trust obligation to ensure the political integrity of tribal governing documents. In *California Valley Miwok Tribe*, the plaintiff and a very small group of supporters went "rogue" and created a new constitution that was clearly not supported by the majority of the tribe. *Id.* at 1267. The Secretary declined to approve the constitution under the IRA. The D.C. Circuit held that the

Secretary reasonably exercised its discretion because the constitution did not "reflect majoritarian values." *Id.* at 1267–68.

Plaintiffs' reliance on *California Valley Miwok Tribe* is misplaced for two reasons. First, the D.C. Circuit held only that the Secretary's decision not to approve the rogue constitution under the IRA (which, as explained above, does not control the case before us) was a reasonable exercise of her discretion, given the government's "obligation . . . to promote a tribe's political integrity." *Id.* at 1267. It did not hold that the BIA *must* refuse to respect the governing document of a tribe (particularly where the BIA is only asked to apply, and not approve, that document) if Plaintiffs complain that it does not reflect their wishes.

Second, the AS-IA's decision indicates that, in the BIA's judgment, the 1997 Constitution sufficiently reflected the will of the Band in order to warrant the acknowledgment of the federal government. The AS-IA acted within the confines of his discretion in concluding that even if there were some procedural problems in the adoption of the 1997 Constitution, between the approval of Resolution 97-36 at the 1997 General Council meeting and the general election in 1994, the new constitution had been validly approved. Moreover, the 1997 Constitution is not as obviously counter-majoritarian as the constitution at issue in *California Valley Miwok Tribe*. We defer to the AS-IA's reasoned judgment that the 1997 Constitution was the valid governing document of the tribe. *See San Luis & Delta-Mendota Water Authority*, 747 F.3d at 601. A generalized invocation of the government's trust responsibility toward Native Americans does not compel the conclusion that the BIA acted arbitrarily or capriciously under these circumstances.

## IV.      Collateral Estoppel

Plaintiffs also argue that the tribe should be bound by the BIA's 1989 decision that Margarita was a full-blooded Pala Indian, by virtue of *res judicata* and collateral estoppel principles. We find this argument unavailing. The 1989 decision was made pursuant to the 1961 Ordinance, which vested the BIA with authority over enrollment decisions. As we have noted, that law changed with the adoption of the 1997 Constitution and then the 2009 Ordinance, which gave the Executive Committee the power to "reevaluate" previous membership decisions and remove members from the rolls.

Because the Executive Committee now has ultimate authority over enrollment decisions under the 1997 Constitution and 2009 Ordinance, the AS-IA reasonably concluded that any questions of the surviving preclusive effect of the 1989 decision are properly directed to the Band, not the BIA.

## V.  Joinder of Minors

The AS-IA declined to join two disenrolled minors to the agency appeal, because the minors had not challenged their disenrollment before the Regional Director. This was reasonable. The AS-IA was "addressing appeals from the Regional Director's letters," and thus the claims of the minors, who had not suffered any adverse decision from the Regional Director, were "not within the scope of the issues pending before the [AS-IA]."

## CONCLUSION

In reaching our decision, we recognize with regret that Plaintiffs will suffer severe and significant consequences from losing their membership in the Pala Band. It is also plausible that Plaintiffs were disenrolled unjustly, or in a manner not in accordance with tribal law. But the AS-IA aptly noted that "in the exercise of sovereignty and self-governance, tribes have the right, like other governments, to make good decisions, bad decisions, and decisions with which others may disagree." The federal government does not interfere in those decisions in the absence of specific authority to do so.

The district court's grant of summary judgment, upholding the decision of the AS-IA, is **AFFIRMED.**

Defendants' motion to supplement the record on appeal (Dkt. 26) is **GRANTED.**

Plaintiffs' motion for judicial notice (Dkt. 34, 43) is **DENIED.**